MICHAEL J. HOGAN, Respondent, v HERALD COMPANY, Doing Business as SYRACUSE HERALD JOURNAL, et al., Appellants, et al., Defendants.

Fourth Department, January 29, 1982

APPEARANCES OF COUNSEL

*Bond, Schoeneck & King* (*S. Paul Battaglia* of counsel), for appellants.

*Carl T. Putzer* and *Joseph A. Ryan* for respondent.

OPINION OF THE COURT

SIMONS, J. P.

Plaintiff brings this action seeking $2,000,000 compensatory and punitive damages claiming injury as the result of a defamatory news article written by defendant Sperber and published by his employer, defendant Herald Company, in its newspaper, the *Syracuse Herald-Journal*. The article repeated a false claim that plaintiff had been arrested for criminal mischief. Defendants moved for summary judgment and the motion was denied as to the libel cause of action.[1] They appeal, contending that Special Term erred in that (1) the news article was a matter of legitimate public concern and privileged because in publishing it defendants did not act in "a grossly irresponsible manner" within the rule of *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196), (2) the article was privileged under the doctrine of "neutral reportage" (see *Edwards v National Audubon Soc.* (556 F2d 113, cert den *sub nom. Edwards v New York Times Co.,* 434 US 1002) and (3) plaintiff has failed to allege special damages in his complaint or motion papers and, therefore, he may not recover compensatory or punitive damages unless he proves "actual malice" as defined in *New York Times Co. v Sullivan* (376 US 254). In support of this position defendants cite the decision of the Appellate Division, First Department, in *France v St. Clare's Hosp. & Health Center* (82 AD2d 1).

---

1. The complaint alleges causes of action in malicious prosecution, slander, libel, negligence and violation of section 1983 of title 42 of the United States Code based upon the political "dirty trick" that defendants perpetrated. There is no cross appeal from Special Term's order dismissing plaintiff's other causes of action.

Special Term held that there are questions of fact concerning the culpability of defendants' conduct under the *Chapadeau* rule which require a trial. We agree. The order should be modified, however, to grant partial summary judgment to defendants, dismissing plaintiff's claims for punitive damages. Punitive damages may not be recovered in a libel action against the publisher or broadcaster of a defamatory falsehood unless plaintiff establishes that the defendant acted with "actual malice" (*Gertz v Robert Welch, Inc.*, 418 US 323, 349; *Chapadeau v Utica Observer-Dispatch*, 38 NY2d 196, 199).

At the time this cause of action arose plaintiff was an 18-year-old student. His father, Girard M. Hogan, was the incumbent Supervisor of the Town of Cicero in Onondaga County and was seeking re-election. Mr. Hogan was opposed in the primary and the general elections by defendant Roehm, a town councilman who also had been the town board liaison to the police department. Defendant Slattery was the town's Chief of Police.

On August 20, 1979 an automobile owned by defendant Mahoney was damaged while parked in front of a bar in Cicero. Mahoney filed a complaint with the police, accusing plaintiff of causing the damage. The matter was investigated by Chief of Police Slattery and on August 21, 1979 he issued an appearance ticket charging plaintiff with criminal mischief in the fourth degree. That same day affidavits were filed with the police department stating that plaintiff had not damaged Mahoney's vehicle, and apparently the appearance ticket was never served on him. Plaintiff has never been arrested.

On October 8, 1979 Roehm was removed as liaison to the police and that removal led to Sperber's article which appeared in the *Syracuse Herald-Journal* on October 9, 1979. In the article it was stated that Roehm claimed that he had been removed as liaison to the police for "political reasons and possibly because the town police had arrested Hogan's son last month." The article continued:

"Michael Hogan, 18, was arrested on a criminal mischief charge at the Grape N Grog bar on Brewerton Road last month after he and some friends allegedly damaged a car,

Roehm said and the police department confirmed. Town Justice Harvey Chase said that the case is due to be heard in his court at a future date. A police [*sic*] official said Hogan called the department several times after the arrest. Hogan today denied any attempts to intervene in the matter, adding he isn't even aware his son is facing trial, saying he's seen nothing in writing to that effect * * *

"Hogan's son would not comment on the arrest, other than to say 'It was all a joke,' adding 'That was taken care of.' He later said he did not mean to imply his father had intervened."

The article also reported Hogan's statement that Roehm was removed as liaison because of increased costs in the police department and the increased crime rate in the town since Roehm had been in office.

On October 10 a second article appeared in defendants' paper in which Mr. Hogan denied that plaintiff had been arrested, although he acknowledged that a formal complaint had been issued. The article also reported Mr. Hogan's version of the police department's investigation of the matter. In giving the story's background, it stated that the previous article had "quoted" Roehm's charge.

Defendant Sperber alleges in his moving papers that in preparing his story he spoke with Roehm and obtained the charges from him. He stated that he then called plaintiff's father who told him that Roehm was removed because of the manner in which the police department had been operated; he called the Chief of Police and was told that plaintiff had been arrested on the criminal mischief charge and that Mr. Hogan had called him "on more than one occasion" about the matter; and he contacted the Cicero Town Justice and asked him "about the pending criminal matter." The Town Justice told him, he said, that the "case" was due to be heard in his court later that month. Sperber stated that he did not recall whether he asked the Town Justice if plaintiff had been arrested, but he assumed by the Justice's answer that he was speaking about the criminal mischief charge. Sperber then contacted plaintiff and his father once again and obtained the answers and quotations from them which appeared in the news article.

Sperber's affidavit implies that plaintiff did not deny the arrest when called, but the record does not support that claim.

Plaintiff submitted the affidavit of his father in opposition to the motion. Mr. Hogan alleged that Sperber's article was inspired by political vindictiveness and malice directed against him not only by Roehm and Slattery, whom he claimed Sperber knew to be political allies, but by Sperber himself. He stated that when Sperber had called him before writing the article he told Sperber that plaintiff had not been arrested, that Sperber should not print that he had been and that he should check the public records first.

The libel is described generally in the complaint and the relatively short offending article has been annexed to it, thereby satisfying reasonable notice pleading requirements and the provisions of CPLR 3016 (subd [a]) (see CPLR 3014; *Cabin v Community Newspapers,* 50 Misc 2d 574, 579 [MEYER, J.]). As noted, the statement that plaintiff was arrested is false. Further than that, the article implies that plaintiff and his father "fixed" the arrest and it is, therefore, "reasonably susceptible" of a defamatory interpretation (see *James v Gannett Co.,* 40 NY2d 415, 419-420). Since it exposes plaintiff to "public contempt, ridicule, aversion and disgrace", it is actionable as libel per se unless privileged.

I

Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name. Under traditional common-law rules, one guilty of defaming another is strictly liable for the resulting damages. Strict liability collides with constitutional principles of free speech and press, however, and the courts' attempts to balance the competing concerns of the individual in his good name and of society to information and news has resulted in a major recasting of the law of libel as it relates to those gathering and disseminating the news. In *New York Times Co. v Sullivan* (376 US 254, *supra*), the Supreme Court stated that broad dissemination of the news and robust public debate were essential to a free society and a democratic government, that publishers

and broadcasters were an essential part of the information system and should be encouraged to participate in the debate on public issues and that strict liability inhibited such participation. Accordingly, it held that the Constitution limits a State's power to award damages in a libel action brought by a public official against his critics unless he proves that the statement was made with "actual malice", i.e., knowledge of its falsity or reckless disregard of whether or not it was false.[2] Subsequently, the court considered the problem of strict liability for libel in an action involving a private individual. It recognized that private individuals who have not placed themselves in the public spotlight and have limited access to the media for self-help are more vulnerable than public officials and public figures and, conversely, that they are more deserving of protection because the State has relatively less interest in the free dissemination of news about them. The court held, therefore, that the States were free to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual" so long as they did not impose liability without fault (*Gertz v Robert Welch, Inc.,* 418 US 323, 347, *supra*).[3] New York did so in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199, *supra*) in which the Court of Appeals held that "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish * * * that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."

---

2. Plaintiff's motion papers and brief are devoted largely to demonstrating the spite and ill will that existed between plaintiff's father on the one hand and defendants Sperber, Roehm and Slattery on the other. This showing of "common-law malice" is largely irrelevant to the issues before us on this appeal.

3. Arguably, free speech considerations suggest that strict liability should be abolished and a fault standard of negligence or gross negligence applied in cases involving private defamation also (see, e.g., Restatement, Torts 2d, § 580B). The Court of Appeals has not ruled on the question (see *Rupert v Sellers,* 65 AD2d 473, 474, affd 50 NY2d 881, cert den 449 US 901; and cf. *France v St. Clare's Hosp. & Health Center,* 82 AD2d 1).

Plaintiff is a private individual but paradigmatically the subject matter of this article (political preference and a political election) is a matter of "legitimate public concern". Accepting the allegations in Mr. Hogan's affidavit as true, as we must (see *Karaduman v Newsday, Inc.,* 51 NY2d 531, 540-541), we find them sufficient to raise a question of fact as to whether the publication is privileged because defendants failed to exercise the care ordinarily followed by responsible parties in the news industry (see *Kerwick v Orange County Pub. Div. of Ottaway Newspapers,* 53 NY2d 625; *Chapadeau v Utica Observer-Dispatch, supra,* p 199; *Cottom v Meredith Corp.,* 65 AD2d 165). Sperber was reporting a bitter political campaign. In preparing the article he was confronted with serious charges of criminal activity and political impropriety, involving not only one of the candidates but also a member of the candidate's family not otherwise involved in the campaign. Arguably, the false report of plaintiff's arrest, and the implication that it had been "fixed", could determine the outcome of the election. Given these circumstances, Sperber's apparently casual questioning of the Town Justice and his acceptance of the Judge's ambiguous response to his question, his failure to credit the flat denial of the charges by plaintiff's father before publication, or at least investigate it further, and the ready accessibility to him of the means to determine the truth of Roehm's claim of arrest, persuade us that defendants' conduct should be judged by a jury (cf. *Robart v Post-Standard,* 74 AD2d 963, affd 52 NY2d 843; *Grobe v Three Vil. Herald,* 69 AD2d 175, affd 49 NY2d 932).

## II

■ Defendants further contend that the statements are absolutely privileged as an objective report of newsworthy charges with proper attribution to sources. They claim, therefore, that no defamation action can be maintained for those charges because (a) attribution negatives the defamatory nature of the report and (b) truth or falsity of the charges is immaterial. This is the so-called doctrine of "neutral reportage" stated in *Edwards v National Audubon Soc.* (556 F2d 113, 120, *supra*).

In *Edwards* an official of the Audubon Society made charges against plaintiffs, eminent scientists and public

figures, stating that they were misinterpreting the society's bird count data to support their views in the public controversy over the effect of DDT on bird life and that they were "paid liars" speaking for the pesticide industry. The court found the newspaper immune from suit for publishing the quotations, holding that the publication was constitutionally privileged under a doctrine of neutral reportage. It noted that what was newsworthy about the accusations was not the truth or falsity of them, but "that they were made" by an official of a prominent and responsible national organization about distinguished scientists who opposed the society's view on a matter of public concern.

Of course, one who repeats a libel is normally responsible even though the republication consists only of a quotation (see *Cianci v New Times Pub. Co.,* 639 F2d 54, 61; Restatement, Torts 2d, § 581, p 231; Prosser, Laws of Torts [4th ed], p 798: cf. *Anderson v New York Tel. Co.,* 35 NY2d 746). There is a notable exception to this rule, however, known as the rule of fair report. The *Edwards* decision is an extension of it (see, also, *Cianci v New Times Pub. Co.,* 639 F2d 54, *supra* [explaining and limiting *Edwards*]; *Dickey v CBS, Inc.,* 583 F2d 1221 [rejecting *Edwards*]; *Dixson v Newsweek, Inc.,* 562 F2d 626 [stating the *Edwards* rule applied only to public figures]; Crass, 1978 Utah L Rev, p 347; Pautler, 1979 U of Ill LF p 943).

◼ Generally stated, the common-law rule of fair report permits the privileged publication of (1) the public proceedings of governmental bodies, (2) which are fairly and accurately reported, (3) in good faith and without malice or intent to harm, and (4) which report official activity (see, generally, Sowle, Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report, 54 NYU L Rev 469, 473-476; Prosser, Law of Torts [4th ed], p 830 *et seq.;* 1 Harper and James, Law of Torts, § 5.24). In New York the privilege has been codified in section 74 of the Civil Rights Law which provides that publication of a fair and true report of any judicial, legislative or other official proceeding is absolutely privileged.

The principal theory behind the rule of fair report is that the publisher acts as the agent of the public, reporting only

that which others could hear for themselves were they to attend the proceedings. It has also been justified on policy grounds because the public has supervisory or oversight responsibilities over public bodies and officers. Normally the privilege does not extend to nongovernmental proceedings because the public has no oversight responsibility for their conduct (but see Restatement, Torts 2d, § 611, comment *i*). In a case analogous to this one it has been held that the New York statute does not extend the privilege to private statements by public officers to newspaper reporters (see *Kelley v Hearst Corp.*, 2 AD2d 480, 483).

█ In *Edwards v National Audubon Soc.* (556 F2d 113, *supra*), the court expanded this common-law rule of fair report to include private statements by private individuals and elevated it to the status of a constitutional privilege, thereby upsetting the balanced rights previously established by the Supreme Court in *New York Times* and *Gertz* (*supra*). It immunized the publication of defamatory falsehoods even though known to be such by the publisher by creating a special category of absolute privilege for attributed quotations. There was no agency or oversight justification for applying the common-law fair report privilege in *Edwards* (*supra*). Obviously, members of the public could not "attend" to hear the charges in person and they had no control over the actions of the scientist plaintiffs. The privilege was extended and given constitutional status solely because the court perceived informational value to the public in the publication of the charges; they were newsworthy.

The Supreme Court has not adopted *Edwards* (*supra*) and in our view it is not possible to reconcile it with that court's prior decision in *Gertz* (418 US 323, *supra*). The unequivocal holding of *Gertz* is that a publisher's immunity is based upon the status of the plaintiff, not the subject matter of the publication. Presumably, all publications of the news media are newsworthy. They are not privileged, however, unless the publisher is free of culpable conduct under the standards stated in *New York Times v Sullivan* (376 US 254, *supra*), *Gertz v Robert Welch, Inc.* (*supra*) and,

in New York, *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, *supra*).

Defendants cite *Orr v Lynch* (60 AD2d 949, affd 45 NY2d 903) and *Campo Lindo for Dogs v New York Post Corp.* (65 AD2d 650) as standing for the proposition that New York has recognized a constitutional privilege of neutral report. Those Third Department cases cite *Edwards,* but they do not recognize a neutral report privilege. In denying liability, the court deciding *Orr* applied the *Times* actual malice test and in *Campo Lindo* it applied the *Chapadeau* test. Recently, in *Russo v Padovano* (84 AD2d 925), this court noted without discussion that defendant claimed the benefit of the *Edwards* rule. The court refused to consider it, however, because the report was not neutral (see to the same effect the Second Department's decision in *Schermerhorn v Rosenberg,* 73 AD2d 276, 288). We now hold the rule of *Edwards v National Audubon Society* does not apply in this department.

### III

Finally, defendants contend that because plaintiff. does not allege special damages, he must establish defendants' actual malice or have his complaint dismissed. To support their argument, they rely on language found in the *Gertz* case concerning punitive and presumed damages and the First Department's holding in *France v St. Clare's Hosp. & Health Center* (82 AD2d 1, *supra*). We do not read the Supreme Court rulings as supporting defendants' position.

In *New York Times Co. v Sullivan* (376 US 254, *supra)* and *Curtis Pub. Co. v Butts* (388 US 130), the Supreme Court made it clear that public officials and public figures could not recover for defamation by the news media unless they established defendant's knowledge or reckless disregard of the falsity of the defamatory statement. In *Gertz* (*supra*) the court addressed the issue of recoverable damages for private individuals and held that private individuals could not recover punitive or presumed[4] damages unless they established this same *New York Times*

---

4. Some authorities define presumed damages as punitive damages (see 25 CJS, Damages, § 2, p 623; 22 Am Jur, Damages, § 236, p 322). That does not appear to be the meaning ascribed to the term in *Gertz* (*supra*).

malice. Absent such proof, a private plaintiff's recovery must be limited to compensatory damages for actual injury which the court defined as follows: "Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of *actual* harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and *all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury*" (*Gertz v Robert Welch, Inc., supra,* p 350; emphasis added).

The stated rationale for this limitation is that the government's only legitimate interest is in compensating the defamed individual and if juries have discretion to award damages far in excess of actual damages, the judgment serves as a penalty which exacerbates the problem of media self-censorship.

The law in New York governing libel per se, i.e., a libel in which the fact of defamation is clear from the publication itself, has necessarily been modified in news media cases by these constitutional decisions which prohibit the recovery of presumed damages. Formerly, a plaintiff alleging libel per se could recover actual damages upon proving the libel; injury was presumed from the nature of the defamatory statement because damage to reputation, humiliation and mental anguish were considered its natural and proximate results. Although these constitutional rules are conceptually inconsistent with New York decisions, it is now established that even in cases of libel per se, damage may not be presumed in the absence of *Times* malice but must be proved. That is not the same, however, as saying that special damages, as the term is used by New York courts, i.e., as the loss of something having economic or pecuniary value (see discussion of special damages, 2 NY PJI 29, 32, 1981 Supp; see, also, Restatement, Torts 2d, § 575) must be pleaded or proved. While special damages as so defined are included in the term actual damages used in *Gertz* (*supra*), the Supreme Court did not limit actual damages to out-of-pocket or pecuniary damage: loss of

reputation, humiliation and mental anguish are also compensable (see Restatement, Torts 2d, § 621; 2 NY PJI 29, 32, 1981 Supp). Thus, contrary to defendants' contention, plaintiff need not establish either actual malice or special damages before he may recover.

To summarize, under *Gertz* a defamation plaintiff may not recover punitive or presumed damages absent proof of actual malice (*Gertz v Robert Welch, Inc.*, 418 US 323, 349, *supra*). Since plaintiff's moving papers do not establish a genuine factual question on the issue of actual malice, his claim for punitive damages must be dismissed (*Bon Air Hotel v Time, Inc.*, 426 F2d 858, 864-865; see *Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, 384, cert den 434 US 969, *supra; Trails West v Wolff*, 32 NY2d 207, 221).

As to compensatory damages, plaintiff alleges in his complaint that he: "was injured in his credit and reputation and he was scorned, ridiculed, harassed and insulted and suffered and still suffers severe and extreme emotional distress and anguish and he incurred special damages including loss *[sic]* earnings of approximately $2,000.00, legal fees of $1,500.00, and other special damages as shall be proven at trial, together with general damages of $500,000.00."

These allegations sufficiently claim actual injuries and though they must be proved at trial (see *Littlefield v Fort Dodge Messenger*, 614 F2d 581, 584, cert den 445 US 945; *Brewer v Memphis Pub. Co.*, 538 F2d 699, on remand 626 F2d 1238, cert den 452 US 962), they need not be supported by affidavit proof on this summary judgment motion.

Defendants' motion for summary judgment should be granted in part and plaintiff's claim for punitive damages should be dismissed. The order appealed should be modified accordingly and as modified it should be affirmed.

CALLAHAN, DOERR, DENMAN and MOULE, JJ., concur.

Order unanimously modified, and as modified affirmed, without costs, in accordance with opinion by SIMONS, J. P.