JOSEPH D'AGROSA, Respondent, v NEWSDAY, INC., et al., Appellants.

Second Department, July 9, 1990

---

**APPEARANCES OF COUNSEL**

*Townley & Updike (Robert Lloyd Raskopf* of counsel), for appellants.

*Mark H. Weiss (Stewart J. Isman* of counsel), for respondent.

**OPINION OF THE COURT**

EIBER, J.

On February 15, 1986, the defendant Newsday, Inc., published an article concerning Kathleen Prime who, in 1974, was hailed by the press a "miracle baby"—the smallest of the more than 28,000 babies that had been born at Brookhaven Memorial Hospital up to that time. Weighing a mere 1 pound, 7 ounces at birth, Kathleen captured the heart of the public through media accounts of her daily struggle for survival. Approximately 12 years later, there was a revival of interest in the "miracle baby" when an article, appearing in Newsday, reported: "Twelve years ago, Kathleen Prime went home from Brookhaven Memorial Hospital a 'miracle baby' * * *. The miracle soon faded, however, when it became apparent she was blind for life".

The Newsday story not only aroused great public interest; it also spawned the instant libel action. The plaintiff, Dr. Joseph D'Agrosa, seeks to recover damages for having been erroneously identified, in the text of the article, as one of the physicians against whom the "miracle baby" recovered a

$1,200,000 malpractice award. The Newsday article, which was written by Pulitzer Prize winning journalist, Joseph Demma, correctly reported that a Suffolk County jury had returned the $1,200,000 verdict in favor of Ms. Prime, "after finding that the [three physicians] who treated her after her birth were 'responsible for the improper administration of oxygen' ". The plaintiff, however, never treated Ms. Prime; he is a dentist.

██ Among the questions to be resolved on appeal are (1) whether the record supports a charge of gross irresponsibility on the part of the defendants in the investigation and dissemination of the information reported in the article, and (2) assuming, arguendo, that the defendants did act in a grossly irresponsible manner, whether the complaint should, nevertheless, be dismissed by virtue of the plaintiff's failure to plead special damages, which is required when the allegedly libelous statement refers to a mistake or impropriety on an isolated occasion—the so-called single-instance rule. Although the record, in our opinion, presents triable issues of fact as to whether the defendants breached standards of news gathering and dissemination, we conclude that the instant claim falls within the ambit of the single-instance rule and that the plaintiff's failure to allege special damages necessitates the dismissal of his complaint.

## I.

On Friday, February 14, 1986, at approximately 4:30 P.M., Newsday reporter Joseph Demma, after conferring with a "source" at the Supreme Court, Suffolk County, learned that a verdict had been reached in the case of *Prime v Brookhaven Mem. Hosp.* Believing the story to be of significant public concern, Demma contacted the attorney who prosecuted the malpractice action on behalf of Ms. Prime. The attorney provided Demma with the names of the physicians against whom the verdict had been rendered as well as information that the three physicians had been in partnership together in East Patchogue. Prime's attorney, however, neglected to mention the fact that one of the physicians, who was also named Joseph D'Agrosa, had died prior to the rendition of the verdict.

In order to verify the information supplied by Prime's attorney, Demma proceeded to check the 1984 or 1985 edition of the Suffolk County telephone directory for the names and

telephone numbers of the three physicians who had been mentioned. Although Demma was unable to find a listing for a Dr. D'Agrosa of East Patchogue, the directory did contain a listing for a Joseph D'Agrosa of Miller Place. During the course of his pretrial deposition, Demma testified:

"I could not find D'Agrosa in Patchogue. But I did find a Joseph D'Agrosa in Miller Place.

"Q Could you tell me what kind of doctors Drs. Lazarou and Sohn practice, or what kind of doctors they are?

"A They were pediatricians. It was my understanding that they were pediatricians.

"Q And you found a spot in the phone book with their names listed?

"A Yes.

"Q Do you recall how they were listed, in other words, do you remember whether or not there was any designation after their names such as M.D. or other?

"A I don't recall it.

"Q You say that after the conversation you did locate a certain Dr. D'Agrosa who was located in Miller Place?

"A Right. Dr. Joseph D'Agrosa, right.

"Q Do you know whether or not there was any designation after the D'Agrosa's name indicating the type of medicine or otherwise that he practiced?

"A At that time?

"Q Yes.

"A I don't know exactly what it was. I saw it. There's a D.D.S. next to his name. I've been around on this, I cannot tell you why D.D.S. didn't jump out at me. But in trying to reconstruct it I took the phone number down and I called it, and the service answered, and to my best recollection she said, 'Doctors office.' And I said I wanted to get in touch with Dr. D'Agrosa. And she said, 'He's not in.' I took a message, I told her it was very important that he calls me. Understand this is one part of it during we're talking about the call coming in between four-thirty and five and by seven o'clock I had to have a story put together. I had been in contact with a number of people, several editors, the assistant day editor, assistant night editor."

Time pressures notwithstanding, Demma met his deadline. His article concerning the "miracle baby" malpractice verdict appeared on page 11 of the Nassau and Suffolk County edi-

tions of Newsday on Saturday, February 15, 1986. He reported, in the final paragraph of the article, that the three physicians against whom the "miracle baby" had prevailed "were identified as Joo Sohn and J. L. Lazarou of Patchogue and Joseph D'Agrosa of Miller Place. None of the physicians returned phone calls yesterday. Their attorney, Clifford Bartlett, was unavailable".

Not long after publication, Robert Thompson, a Newsday editor, contacted Demma by telephone and advised him that he had identified the "wrong Dr. D'Agrosa" in the article and that D'Agrosa, the pediatrician, had died during the pendency of the medical malpractice action. Demma's reaction to this information, as described in his pretrial deposition, is revealing. He indicated that, after being apprised of the error: "I went into the phone book and I saw in the phone book, my phone book at home, that he has a D.D.S. on it, and I said—he said, 'Well, how did this happen?' And we tried to figure out how it happened. And I told him I didn't know how it happened. I said, 'It's obvious if you look at the phone book it says D.D.S., and we're dealing with pediatricians not dentists'."

In an apparent attempt to rectify the error, Newsday printed the following "retraction", which appeared on page two of the February 16th, 1986, Nassau and Suffolk County editions of the Sunday paper:

### "CORRECTION

"An article in yesterday's edition on a $1.2 million malpractice award incorrectly identified the community in which one of the doctors named in the suit had his practice. The doctor, Joseph D'Agrosa, practiced in Patchogue".

Dissatisfied with the retraction, Dr. D'Agrosa—the dentist—commenced the instant action to recover damages for libel, alleging that defendants Demma and Newsday, Inc., wrote and published the article without taking "proper steps to ascertain its accuracy [and] * * * without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties". The plaintiff further alleged that the statement in the article, erroneously linking him to the malpractice action, not only injured his "character and reputation in the community", but also caused him to suffer "personal humiliation * * * and mental anguish". Although the plaintiff sought compensatory and puni-

tive damages in the aggregate amount of $1,500,000, his complaint contained no specifics regarding the pecuniary losses he allegedly sustained as a result of the publication of the article.

The defendants answered the complaint, and, after appropriate discovery, moved for summary judgment. In support of the motion, the defendants stressed the fact that the misidentification of the "community" in which Dr. D'Agrosa had practiced was unintentional and not the result of ill-will or malice toward the plaintiff. The plaintiff, in opposition, insisted that the defendants were, nevertheless, grossly irresponsible in writing and publishing an article which contained false information.

The Supreme Court, relying upon the case of *Michaels v Gannett Co.* (10 AD2d 417), implicitly rejected the notion that dismissal of the action was warranted on the ground that the defendants did not intend to refer to the plaintiff in the article. The court, instead, found that triable issues of fact existed as to whether the article was susceptible of a libelous interpretation and that resolution of this issue, as well as the question of special damages, must await a trial.

The defendants now appeal.

## II.

■ An appropriate place at which to begin our analysis is with the standard to be applied in determining a media defendant's liability for the publication of defamatory falsehoods about a private individual. The prevailing standard, as set forth by the Court of Appeals in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199), is that "where the content of the article is arguably within the sphere of legitimate public concern", the defamed party must establish that the publisher "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties".

There is no real dispute, in the present case, that the subject of the article—the "miracle baby" malpractice verdict —was a matter of legitimate public concern. Nor do the defendants controvert the fact that they made a mistake when they identified the plaintiff as one of the physicians against

whom the malpractice verdict had been rendered.[1] Whether this mistake amounted to "gross irresponsibility" on the part of the defendants was, in our opinion, properly found to be a question of fact for the jury.

In their quest for a reversal of the order appealed from, the defendants focus on the efforts expended by Demma to insure that the information he obtained was reliable and accurate. There is no doubt that Demma consulted with two unquestionably authoritative sources—Ms. Prime's attorney and the law clerk of the Judge who presided over the malpractice trial. It is also true that both sources confirmed the fact that a Dr. Joseph D'Agrosa was one of the physicians involved in the malpractice action. The propriety of the methods of verification subsequently employed by the defendants as well as their claim that the mistake was an "honest one" *(see, Kuan Sing Enters. v T. W. Wang, Inc.,* 86 AD2d 549, *affd* 58 NY2d 708; *see also, Simonsen v Malone Evening Tel.,* 98 AD2d 905) are, however, matters which may be called into question given the fact that Demma, pressed by the exigencies of an impending deadline, apparently made a conscious and deliberate decision to rely upon a telephone book listing which referred to a dentist from an entirely different location from that specified by one of his authoritative sources.

The record contains ample proof to support the foregoing conclusion. It also contains sufficient facts from which a jury could readily find that the defendants had substantial reason to doubt the accuracy of the disputed portion of the article and that they acted in a "grossly irresponsible manner" by printing the information without conducting further investigation *(see, Udell v New York News,* 124 AD2d 656; *Zucker v County of Rockland,* 111 AD2d 325; *Hogan v Herald Co.,* 84 AD2d 470, *affd* 58 NY2d 630). The most damaging evidence is Demma's own deposition testimony. He acknowledged, for example, that he was aware of the fact that the malpractice

1. Consistent with the approach taken in their "retraction", the defendants insist that the article merely misidentified the "community" in which Dr. D'Agrosa practiced, a claim clearly intended to negate the element of defamation which requires that the defamatory statement be "of or concerning" the plaintiff *(see, Gross v Cantor,* 270 NY 93). It is, however, impossible to say, as a matter of law, that those who read the article would be cognizant of this fine distinction. A more likely conclusion is that the average reader was left with the impression that it was the plaintiff who had been found guilty of malpractice since the article referred to a person of the same name and street address as the plaintiff *(see, Michaels v Gannett Co.,* 10 AD2d 417, 419; *cf., Bee Publs. v Cheektowaga Times,* 107 AD2d 382).

defendants were pediatricians, that they practiced in East Patchogue, that he could not find a listing in the telephone directory for a Dr. D'Agrosa in Patchogue and, instead, utilized an entry which not only referred to a Miller Place address but also bore the notation "D.D.S." next to D'Agrosa's name. In addition, Demma bluntly admitted during the deposition that he recalled having experienced "problems" or "difficult[ies] getting confirmation" but that he and several Newsday editors were anxious to meet the 7:00 P.M. publication deadline. Demma's reaction to his error, as previously indicated, merely adds fuel to the fire. He stated, in no uncertain terms, that he could not explain why "D.D.S. didn't jump out at me", and that "[i]t's obvious if you look at the phone book it says D.D.S., and we're dealing with pediatricians not dentists".

The question of whether the defendants breached controlling standards of news gathering and dissemination, in light of the information set forth above, was clearly an issue of fact. The defendants cannot fairly claim that they justifiably relied upon inaccurate information, as was the situation in many of the cases cited in their brief (see, Gaeta v New York News, 62 NY2d 340; Robart v Post-Standard, 52 NY2d 843, affg 74 AD2d 963; Carlucci v Poughkeepsie Newspapers, 88 AD2d 608, affd 57 NY2d 883).[2] Rather, it appears that Demma and his editors disregarded what was otherwise accurate information and that they yielded to temptations of expediency, by proceeding on the assumption that the D'Agrosa listed in the telephone book was the one involved in the Prime case, failing, of course, to take note of the obvious fact that they were wrong.

In sum, the record in this case presents a clear dispute as to whether the investigatory practices employed by the defendants conformed to the standards of care enunciated in Chapadeau (supra). Although the defendants vigorously contend that they engaged in "a conscientious effort to report the story precisely", the relevant facts, as recounted above, tend to suggest the contrary. Given these circumstances, it cannot be

---

■ **2.** Nor did the defendants publish an "effusive apology" as was the situation in Kuan Sing Enters. v T. W. Wang, Inc. (86 AD2d 549, affd 58 NY2d 708) upon which they also rely. A more apt description of the defendants' "retraction" is evasive since they did no more than correct the reference to D'Agrosa's community, leaving unchanged the impression that they had identified the correct malpractice defendants in their original article.

said that the Supreme Court erred when it concluded that the propriety of the defendants' conduct should be judged by a jury.[3]

### III.

■ There remains for consideration the question of whether the defendants are, nevertheless, entitled to a dismissal of the complaint under the single-instance rule. A concept of rather ancient vintage, the single-instance rule pertains to language charging a party with a single dereliction in connection with his or her trade, occupation or profession (see, e.g., November v Time Inc., 13 NY2d 175). Because such a statement does not accuse a party of general ignorance or lack of skill, it is not deemed actionable unless special damages are pleaded and proven (see generally, 43 NY Jur 2d, Defamation and Privacy, § 29; 2 NY PJI 706; see also, Matherson v Marchello, 100 AD2d 233, 236-237, n 3).

As early as 1914, this court, in Twiggar v Ossining Print. & Publ. Co. (161 App Div 718), was asked to apply the single-instance rule in a situation somewhat analogous to the matter at bar. The Twiggar case involved the publication of an article which reported that a malpractice action had been commenced against Dr. Twiggar—a dentist—based upon the " 'unskillful and negligent' way in which dental work was done" (at 719). Dr. Twiggar sued the publisher to recover damages for libel, but failed to include allegations of special damages in his complaint. On appeal, this court found that since the article referred to a charge of "ignorance or want of skill" on a single occasion only, proof of special damages was a necessary component of the plaintiff's cause of action. Because Dr. Twiggar did not plead special damages, his complaint was dismissed as deficient.

Similarly, in Amelkin v Commercial Trading Co. (23 AD2d 830, 831, affd 17 NY2d 500), an employee of an insurance company commenced a libel action on the basis of a letter written by the defendant which charged him with neglect in the processing of a particular insurance policy. The complaint

---

3. We take this opportunity to observe that while there may be sufficient evidence to support a charge of "gross irresponsibility", it appears highly unlikely, at least on this record, that the plaintiff would prevail on his claim for punitive damages, which requires a showing of "actual malice" (see, Corrigan v Bobbs-Merrill Co., 228 NY 58, 66-67; Wood v Lee, 41 AD2d 730, 731; Clevenger v Baker Voorhis & Co., 19 AD2d 340, affd 14 NY2d 536; Frechette v Special Mags., 285 App Div 174, 175).

did not allege special damages. The Appellate Division, First Department, in a memorandum decision affirmed by the Court of Appeals, held (at 831): " 'Language charging a professional man with ignorance or mistake on a single occasion only and not accusing him of general ignorance or lack of skill cannot be considered defamatory on its face and so is not actionable unless special damages are pleaded' *(November* v. *Time,* 13 N Y 2d 175, 178). At best, what plaintiff is charged with is that he acted improperly on a single occasion, and the charge is not broad enough to accuse him of general incompetence or ignorance. Such a limited accusation renders applicable the 'single instance' rule thereby making the failure to allege special damages a defect requiring dismissal of the complaint."

The article which is the subject of this dispute reported that the jury awarded the "miracle baby" $1,200,000 based upon a finding that her treating physicians were responsible for the "improper administration of oxygen". According to the article, the jury further determined that the physicians "should have had her removed to a neonatal intensive care center rather than treat her at Brookhaven".

The statements cited above fall within the compass of the single-instance rule since they did not charge the "miracle baby" physicians with general ignorance, incompetence or lack of skill. The article merely referred to the fact that a jury had found the physicians guilty of malpractice in this particular instance. As a result, Dr. D'Agrosa's failure to plead special damages proves fatal to his claim. We note, however, that although the plaintiff's nonspecific allegations of damages do not meet the stringent requirements for pleading special damages *(see, Lincoln First Bank v Siegel,* 60 AD2d 270, 280; *Continental Air Ticketing Agency v Empire Intl. Travel,* 51 AD2d 104, 108; *Zausner v Fotochrome, Inc.* 18 AD2d 649), the record does contain information which suggests that the plaintiff may have indeed suffered actual pecuniary losses as a result of the defendants' conduct. Because it appears that the plaintiff might be able to remedy the deficiencies in his complaint, he should be permitted, if he be so advised, to seek leave to replead his cause of action, upon an appropriate showing of merit *(see, Zambito v Ryan,* 125 AD2d 462).

We have examined the defendants' remaining contention and find it to be without merit.

Accordingly, the order is reversed, on the law, without costs

or disbursements, the defendants' motion for summary judgment dismissing the complaint is granted, and the complaint is dismissed, with leave to the plaintiff, if he be so advised, to move in the Supreme Court, Suffolk County, for leave to serve an amended complaint.

BROWN, J. P., LAWRENCE and KUNZEMAN, JJ., concur.

Ordered that the order is reversed, on the law, without costs or disbursements, the defendants' motion for summary judgment dismissing the complaint is granted, and the complaint is dismissed, with leave to the plaintiff, if he be so advised, to move in the Supreme Court, Suffolk County, for leave to serve an amended complaint.