James **RICHIE**, et al., Appellants,

v.

**PARAMOUNT PICTURES CORPORATION**, et al., Respondents (CX–94–2249), Defendants (C5–94–2501),

Hubbard Broadcasting, Inc., d/b/a KSTP, et al., Defendants (CX–94–2249),

Kathy Tatone, Respondent (C5–94–2501).

Nos. CX–94–2249, C5–94–2501.

Court of Appeals of Minnesota.

May 30, 1995.

Review Granted July 20, 1995.

Tyrone P. Bujold, Arthur S. Beeman, Robert J. Gilbertson, Robins, Kaplan, Miller & Ciresi, Minneapolis, for appellants.

John P. Borger, Eric E. Jorstad, Faegre & Benson, Minneapolis, for Paramount Pictures Corp., et al.

Kevin P. Hickey, Bassford, Heckt, Lockhart, Truesdell, & Briggs, P.A., Minneapolis, for Kathy Tatone.

Considered and decided by RANDALL, P.J., and DAVIES and JONES,* JJ.

## OPINION

RANDALL, Judge.

Appellants challenge summary judgments granted separately to respondents Paramount Pictures Corporation (Paramount) and MoPo Productions, Inc. (MoPo) and respondent Kathy Tatone on appellants' claims for defamation and false light invasion of privacy.[1] Appellants argue that the district court erred in finding they were required to show actual harm to their reputations to maintain their defamation action and failed to do so. They also contend the district court erroneously determined respondent Tatone was protected by attorney immunity and qualified privilege. We agree that summary judgment was inappropriate and reverse.

## FACTS

Denise Richie, the goddaughter of appellants James Richie (her paternal uncle) and Karen Gerten (her maternal aunt), successfully litigated a civil lawsuit against her parents (not Richie and Gerten) for sexual

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. Although appellants cited it as an issue in their statement of the case, they did not brief the issue of whether summary judgment was improperly granted on their claims under the tort of false light invasion of privacy. We therefore do not consider this issue. *See Balder v. Haley,* 399 N.W.2d 77, 80 (Minn.1987) (issue not argued in briefs deemed waived on appeal).

abuse. Her father was found liable for sexually abusing Denise and her mother for failing to intervene. Denise was awarded a large jury verdict in the action, in which she was represented by respondent Kathy Tatone.

A representative of the Maury Povich show (the "show"), a nationally broadcast talk show, learned of Denise's case and contacted Tatone to arrange for Denise's appearance on the show. Tatone claims that she handled all of the arrangements; the show's representative contacted Denise directly only once, to determine whether she was articulate and would make a good guest.

The show requested photographs of Denise and her parents (the defendants in the lawsuit) to use in the broadcast. Tatone contacted Denise, who told Tatone to send a photo of her with her parents in which she was wearing a graduation gown. Tatone sent the only photograph she found in Denise's albums in which Denise appeared with a couple and was wearing a gown. The problem was the man and the woman in the photograph were appellants, not Denise's parents. The record does not show any double-checking or further follow up by Tatone to verify that the man and the woman in the photograph were Denise's parents. A second photograph of Denise with her parents and brother was also sent.

A representative of the show said she attempted on the morning of the interview to confirm with Tatone that Denise's parents were the people pictured in the graduation gown photograph and Tatone said they were. Tatone claims not to recall this conversation. The photograph with appellants was selected for use because it was of better quality and in better condition than the other photograph, the one with Denise's parents in it.

The photograph incorrectly featuring appellants as Denise's parents was broadcast several times during the taped interview, when references to Denise's father and mother and their conduct were being made. Appellants became aware of the mistaken use of their likenesses on November 5, 1992, the day the show was broadcast. Both immediately contacted counsel. A retraction was aired on the December 18, 1992, show. The host, Maury Povich, apologized and explained that appellants were not connected with Denise's abuse.

Appellants sued Paramount Pictures and MoPo for defamation and false light invasion of privacy, and Hubbard Broadcasting (the local broadcaster) and Kathy Tatone for defamation. They alleged impairment of their reputations in the community, humiliation, and mental anguish and suffering. Hubbard Broadcasting was dismissed from the action by stipulation.

Paramount/MoPo's second motion for partial summary judgment was granted. The district court found New York law required proof of harm to reputation before a defamation claim can be established and that Minnesota law had to recognize such a limitation under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). It also found appellants could not meet this requirement. In addition, the district court found Minnesota does not recognize the tort of false light invasion of privacy. Judgment for Paramount/MoPo was entered immediately, and appellants filed an appeal.

While appeal was pending, Tatone moved for summary judgment below on grounds of attorney immunity. The district court granted the motion based on qualified privilege and appellants' inability to prove harm to reputation. Appellants appealed that decision as well, and the cases were consolidated by this court.

## ISSUES

1. Did the district court err in concluding appellants had to show they could prove harm to their reputations resulting from the respondents' defamatory actions to withstand summary judgment and failed to do so?

2. If a conflict exists between New York and Minnesota defamation law, which state's laws should be applied in this action?

3. Is Tatone protected from liability to appellants under the rule prohibiting third parties from recovering from an attorney

for activities performed within the scope of the professional relationship?

4. Did the district court err in finding Tatone is protected by a qualified privilege from liability for providing the wrong photograph to the show?

## ANALYSIS

■ When reviewing a grant of summary judgment, an appellate court examines the record to determine whether any issues of material fact exist or whether the district court erred in its application of the law. *Hopkins v. Empire Fire & Marine Ins.*, 474 N.W.2d 209, 212 (Minn.App.1991). Facts are viewed in the light most favorable to the nonmoving party; doubts and factual inferences are resolved against the moving party. *Id.*

### I. Harm-to-Reputation Prerequisite

■ The district court relied on *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), to rule that Minnesota law imposes a harm-to-reputation prerequisite on private figure plaintiffs in defamation cases against media defendants. We do not believe *Gertz* mandates that a plaintiff must show by direct proof that actual harm to reputation has occurred to withstand summary judgment in a defamation case per se, as here, where a direct inference of incest was publicly lodged against appellants.

In *Gertz*, the United States Supreme Court held that private figure plaintiffs cannot recover presumed damages in defamation cases unless actual malice is proved. *Id.* at 350, 94 S.Ct. at 3012. Further, under a lesser standard of proof, a plaintiff is limited to damages for "actual injuries." *Id.*, at 350, 94 S.Ct. at 3012. By broadly defining "actual injuries" to include loss of reputation, mental anguish and suffering and humiliation, however, the Court implied that actual harm to reputation did not have to be established.

*Id.* at 350, 94 S.Ct. at 3012. This was confirmed in *Time, Inc. v. Firestone*, in which the Court stated: "In [*Gertz*] we made it clear that States could base awards on elements other than injury to reputation." 424 U.S. 448, 460, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976).

■ Thus, after *Gertz*, a private figure plaintiff cannot recover for presumed harm to reputation absent a showing of actual malice, at least in cases involving matters of public concern. *Jacobson v. Rochester Communications*, 410 N.W.2d 830, 836 n. 7 (Minn.1987) (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 756, 105 S.Ct. 2939, 2944, 86 L.Ed.2d 593 (1985)).[2] But first amendment principles do not require that harm to reputation be proved as an essential element of a defamation claim. *See, e.g., Little Rock Newspapers v. Dodrill*, 281 Ark. 25, 660 S.W.2d 933, 936 (1983) (imposing harm-to-reputation prerequisite but noting not constitutionally required); *Hearst Corp. v. Hughes*, 297 Md. 112, 466 A.2d 486, 491–93 (1983) (trier of fact constitutionally barred from awarding damages for presumed harm to reputation, but not proven harms); *accord* Restatement (Second) of Torts § 621 at 320 (1977). This point is conceded by respondents in their brief.

■ We conclude that the district court erred in determining as a matter of law that appellants have not alleged facts showing harm to their reputations occurred. Defamation law has long recognized that certain types of defamatory statements are actionable per se without proof of special damages. W. Page Keeton, et al., *Prosser & Keeton on Torts* § 112 (5th ed. 1984). In cases involving such defamatory per se statements, damage to reputation is presumed, and compensatory damages can be awarded on this basis. *See Becker v. Alloy Hardfacing & Eng'g*, 401 N.W.2d 655, 661 (Minn.1987) (rejecting proposed rule requiring plaintiff to substantiate harm to reputation before being allowed re-

---

**2.** The Minnesota Supreme Court has held that the rule against presumed damages stated in *Gertz* does not extend to cases involving non-media defendants. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 258 n. 5 (1980). The court upheld an award based on presumed damages in

*Becker v. Alloy Hardfacing & Eng'g*, 401 N.W.2d 655, 661 (Minn.1987). Appellants do not argue that this case does not involve matters of public concern or that they are entitled to presumed damages.

covery). Under both types of defamation (libel and slander) recognized by the common law, statements imputing to another the commission of a crime—particularly one involving moral turpitude—or serious sexual misconduct constitute defamation per se. Restatement (Second) of Torts § 559–570 (1977); *see also Baufield v. Safelite Glass Corp.*, 831 F.Supp. 713, 717 (D.Minn.1993) ("A statement is defamatory per se if it imputes serious sexual misconduct to the subject of the statement"); *Anderson v. Kammeier*, 262 N.W.2d 366, 372 (Minn.1977) (listing imputation of crime in categories of slander per se).

Here, appellants were wrongly and *publicly* labelled as a father who committed incest and a mother who stood by and let it happen. At least "some" actual injury to their reputations can be assumed from the seriousness of this false statement seen on national TV, at least enough to survive a motion for summary judgment. Common sense tells us that of the hundreds of thousands of possible viewers not all, as a matter of law, thought absolutely nothing ill of appellants, if only to a small degree. Appellants' burden at trial remains the same as the burden on all who claim damages. But we are viewing only a motion for summary judgment in which all factual disputes and inferences are to be resolved in appellants' (the nonmovants') favor. Respondents concede that an accusation of incest is defamatory per se, as they must: taboos against incest exist in innumerable cultures, ancient as well as modern.

After hearing all of the evidence, a jury may conclude that appellants' reputations have not been damaged. But at this point we cannot. The specific evidence of injury offered by appellants in opposing summary judgment is not overwhelming. However, traditional defamation principles dictate our conclusion that at least for purposes of withstanding a motion for summary judgment, appellants have suffered at least some harm to reputation. We note that respondents can renew their motion for judgment at the close of appellants' case in chief, and at the close of all evidence. The district court can dismiss any action rather than submit it to a jury if "the evidence taken as a whole does not reach a threshold which would support a jury verdict of defamation." *McDevitt v. Tilson*, 453 N.W.2d 53, 58 (Minn.App.1990), *pet. for rev. denied* (Minn. May 23, 1990). If, at that stage, appellants have not shown their reputations have suffered—either through direct evidence of harm or evidence supporting an inference of harm—then they should not recover damages under their claims for defamation.

The primary purpose of defamation actions is to impose liability on a defendant for injuries to reputation caused by "unprivileged communication or publication of false and defamatory matter which injures the reputation of another." *Matthis v. Kennedy*, 243 Minn. 219, 222–23, 67 N.W.2d 413, 416 (1954). Damages for emotional distress can be recovered, but only when the plaintiff has established a valid claim for defamation. *See Bradley v. Hubbard Broadcasting*, 471 N.W.2d 670, 677 (Minn.App.1991) (noting emotional distress can be recovered as an element of damages when a plaintiff has been defamed), *pet. for rev. denied* (Minn. Aug. 2, 1991).

## II. Conflict of Laws

The parties dispute whether New York or Minnesota defamation law should be applied in this case. Respondents contend that New York law should be applied, while appellants argue that Minnesota law is applicable. We apply Minnesota's choice of law rules to determine what state's substantive law should be applied in cases involving a conflict of laws. *Schwartz v. Consolidated Freightways*, 300 Minn. 487, 492–93, 221 N.W.2d 665, 668 (1974).

Our first consideration is whether an outcome-determinative conflict of laws exists. *Jepson v. General Casualty Co.*, 513 N.W.2d 467, 469 (Minn.1994). The district court found no conflict existed because it concluded that harm to reputation had to be proved under both states' defamation laws. We find New York law on this issue unsettled.[3] Assuming such a prerequisite exists,

---

3. *Compare France v. St. Clare's Hosp. & Health Ctr.*, 82 A.D.2d 1, 441 N.Y.S.2d 79, 82 (1981)

our decision above creates an outcome-determinative conflict. Further, the two states apply different standards of proof to defamation actions by private figures: Minnesota applies a negligence standard, *Jadwin v. Minneapolis Star & Tribune*, 367 N.W.2d 476, 492 (Minn.1985), and New York a gross irresponsibility standard, *Chapadeau v. Utica Observer–Dispatch*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 64–65, 341 N.E.2d 569, 571 (1975). Because the Minnesota standard is lower, application of either state's laws could be outcome-determinative.

■■■ A second consideration is whether application of either state's law is constitutional. A state must have sufficient significant contacts with the litigation to create state interests in the action so that application of its laws is not arbitrary or fundamentally unfair. *Jepson*, 513 N.W.2d at 469. In this case, both states have sufficient significant contacts to create state interest. Minnesota is the domicile of the plaintiffs, who were injured in Minnesota by a broadcast televised in Minnesota, and one of the respondents is a Minnesota-licensed attorney. The show was produced in New York and the personnel connected with its production are situated there.

When a conflict exists and both states' laws constitutionally could be applied, five "choice influencing" factors are considered:

    (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law.

*Jepson*, 513 N.W.2d at 470.

■■ The first factor, predictability of results, is intended to protect the "justified expectations of the parties to the transaction." *SCM Corp. v. Deltak Corp.*, 702 F.Supp. 1428, 1430 (D.Minn.1988). It "ap-

plies primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." *Hime v. State Farm Fire & Casualty*, 284 N.W.2d 829, 833 (Minn.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). Thus, it generally is not given significant attention in tort cases, which involve unplanned injuries. *See Jepson*, 513 N.W.2d at 470.

Respondents make the interesting argument that this factor favors New York law because the activities involved in producing nationally broadcast publications are planned. They contend broadcasters might be chilled by the possibility of being subject to the varying laws of 50 states. Appellants respond by noting that broadcasters—like car manufacturers—voluntarily expose themselves to liability in all the states to which they send their product. But car manufacturers, unlike media defendants, are not entitled to First Amendment protection; the need for predictability by media defendants, who otherwise would be required to comply with differing laws governing defamation in fifty states, is analogous to the need of those entering into a contract to know which state's laws govern the contract. *See Davis v. Costa–Gavras*, 580 F.Supp. 1082, 1093 (S.D.N.Y. 1984) (First Amendment policy reasons exist for deciding issues impacting media defendants' future behavior according to jurisdiction in which conduct giving rise to defamation occurred). Thus, we conclude that this factor favors applying New York law.

The second factor, maintenance of interstate and international order, requires sufficient contacts between the state whose law is being applied and the litigation to meet due process requirements. *SCM Corp.*, 702 F.Supp. at 1431. As noted above, both states have sufficient contacts with the litigation. The primary interest addressed under this factor, however, is whether applying Minnesota law would "manifest disrespect" for New

(despite defamatory per se statement, summary judgment appropriate where plaintiff offered no proof of harm to reputation or actual malice) *and Salomone v. MacMillan Publishing Co.*, 77 A.D.2d 501, 429 N.Y.S.2d 441, (1980) (reversing denial of summary judgment on grounds that plaintiff could not show he suffered harm to reputation) *with Hogan v. Herald Co.*, 84 A.D.2d

470, 446 N.Y.S.2d 836, 842 (1982), *aff'd*, 58 N.Y.2d 630, 458 N.Y.S.2d 538, 444 N.E.2d 1002 (1982) (proof of harm to reputation not required to withstand summary judgment where statement was libelous per se) *and Matherson v. Marchello*, 100 A.D.2d 233, 473 N.Y.S.2d 998 (1984) (plaintiff not required to plead and prove special damages in cases involving defamation per se).

York's sovereignty or impede interstate commerce. *Jepson*, 513 N.W.2d at 471. Evidence of forum-shopping, or that application of Minnesota's law would promote forum-shopping, would indicate such disrespect. *See id.; Hague v. Allstate Ins.*, 289 N.W.2d 43, 49 (Minn.1978), *aff'd*, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). There is no evidence appellants were forum-shopping when they brought suit in Minnesota, where they reside. Because the plaintiffs reside in Minnesota and were injured in Minnesota, this factor does not weigh in favor of applying New York law.

The third factor, simplification of the judicial task, is usually considered insignificant because courts can just as easily apply another state's laws as their own. *See Jepson*, 513 N.W.2d at 472. As noted above, however, New York law on the issue of a harm-to-reputation prerequisite is unclear. Although the issue has not yet been addressed in Minnesota in cases involving issues of public concern, Minnesota courts are capable of applying Minnesota precedent to resolve this issue. This factor favors Minnesota law.

The fourth factor is advancement of the forum's governmental interest, and is intended to ensure that Minnesota courts are not required to apply laws inconsistent with this state's concepts of fairness and equity. *Hime*, 284 N.W.2d at 833. This factor strongly favors Minnesota's laws. First, we note our conclusion above that summary judgment was inappropriate in this case, given the defamatory per se nature of the defamatory statements. Application of New York law could prohibit further proceedings in this case. Further, the Minnesota Supreme Court explicitly rejected the New York gross irresponsibility standard, finding it "virtually indistinguishable" in practice from the actual malice standard, and finding the actual malice standard too harsh:

> Given that [a private figure]'s sole means to vindicate his or her reputation may be judicial determination that the injurious statement is in fact false, to foreclose that redress by adopting the actual malice standard seems to us to go too far in extinguishing the only protection a private individual may invoke.

*Jadwin*, 367 N.W.2d at 491. Thus, application of New York law could require Minnesota's courts to impose restrictions that are unacceptable under Minnesota law. It also would undermine Minnesota's strong interest in ensuring tort victims receive compensation. *See Jepson*, 513 N.W.2d at 472 ("Minnesota places great value in compensating tort victims").

We do not reach the fifth factor, which should be applied only when the choice of law question remains unresolved after the other factors are considered. *Myers v. Government Employees Ins.*, 302 Minn. 359, 368, 225 N.W.2d 238, 244 (1974). Although the first factor supports application of New York law, the latter two heavily favor Minnesota law. In tort cases, the fourth and fifth factors are considered the most relevant. *Hime*, 284 N.W.2d at 833. We conclude that Minnesota's choice of law rule favors applying Minnesota law in this case.

### III. Attorney Liability to Third Parties

Generally, "an attorney acting within the scope of [her] employment as an attorney is immune from liability to third persons for actions arising out of that professional relationship." *McDonald v. Stewart*, 289 Minn. 35, 40, 182 N.W.2d 437, 440 (1970). Exceptions exist when the attorney acts fraudulently, maliciously, or otherwise commits an intentional tort. *Melrose Floor Co. v. Lechner*, 435 N.W.2d 90, 91 (Minn.App.1989). Tatone argues this rule protects her from liability because she was acting as Richie's attorney when she provided the photograph of appellants to the show.

There is no dispute that appellants are only third parties to the relationship between Tatone and Denise Richie. Further, appellants do not claim Tatone acted fraudulently or with malicious intent. Appellants' argument focuses on whether Tatone was acting as a lawyer on Denise's behalf as contemplated by the rule. If Tatone was not acting as Richie's attorney, immunity would not attach.

The district court specifically found a fact question existed on the issue of whether Tatone was acting as Denise Richie's attorney when making arrangements with the show.

We agree. Tatone testified that she made all the arrangements with the show. It does not appear from the record that she advised either Denise or the show's representatives against communicating directly with one another. There is a fact question as to whether Tatone was simply acting in the capacity of any show business agent, but not as an attorney. Had Tatone submitted the photographs to law enforcement investigating a possible crime or submitted the photographs to someone in the course of discovery as part of litigation, there would be a compelling argument that the submission was in the course of the attorney-client relationship. But those are not our facts. The lawsuit was over. The Maury Povich show heard about it and simply got curious in the same sense that any talk show or tabloid gets curious about matters tinted with sensationalism that might boost coverage or ratings.

We do not state that the attorney-client privilege did or did not shield Tatone in this instance. We merely state that the trial court properly found that a legitimate fact question exists as to whether Tatone "was acting as an attorney" when she simply forwarded a photograph for use on a talk show not in any way connected with pending litigation.

We conclude that a fact question exists on this issue precluding summary judgment on this basis. We again note that Tatone is free to move for a directed verdict at the close of appellants' case or all the evidence.

### IV. Defamation Privilege

■ Minnesota recognizes a qualified privilege for defamatory statements under appropriate circumstances. *Friedell v. Blakely Printing,* 163 Minn. 226, 229–30, 203 N.W. 974, 975 (1925). To be protected by a privilege, a communication must be made on a proper occasion, with a proper motive, and be based upon reasonable or probable cause. *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256–57 (Minn.1980). Whether a proper occasion exists is a question of law for the court to decide. *Lewis v. Equitable Life Assur. Soc'y,* 389 N.W.2d 876, 889 (Minn. 1986).

■ The district court found Tatone was protected from defamation liability by qualified privilege. We disagree. "[T]he existence of a privilege results from the court's determination that statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." *Id.* We find that gratuitously forwarding a photograph of persons to be discussed on a talk show is not the type of occasion for which the qualified privilege is intended. It was gratuitous, not related to any ongoing business or litigation. Richie, Tatone's client, was not a planner or producer, or in any way connected with the show other than as a guest. The gratuitous production of the photograph was not necessary to protect or in any way enhance the civil verdict previously obtained. No harm could come to Tatone's client Richie if the photograph had not been forwarded. The only possible penalty is that Povich might not have wanted Richie to be a guest on the show if there were no photographs. It is hardly a penalty not to get to go on national TV and have intimate details of your life and your parents exposed to the country. We find no reason to protect such activity through the application of an artificially created legal privilege. Tatone's actions will have to rise or fall on the merits without the benefit of a qualified privilege.

### DECISION

The district court erred in granting summary judgment for respondents. It cannot be determined, at this stage of the proceedings, that as a matter of law appellants are unable to establish that they have suffered at least some actual harm to reputation.

A factual issue exists as to whether respondent Tatone was protected by attorney-client immunity when she forwarded a photograph to the Povich talk show.

No qualified privilege for defamation applies to Tatone's alleged defamatory conduct.

**Reversed and remanded for trial.**

DAVIES, Judge (dissenting).

I respectfully dissent for two reasons.

244

First, it would be advisable to read *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), as prohibiting the use of the doctrine of defamation per se to open the door to damages in media cases. That reading of *Gertz* has been applied in a number of jurisdictions and suggested by a number of commentators. *See Little Rock Newspapers, Inc. v. Dodrill*, 281 Ark. 25, 660 S.W.2d 933, 936 (1983) (without a showing of either actual malice or injury to reputation, evidence insufficient to go to jury); *Gobin v. Globe Pub. Co.*, 232 Kan. 1, 649 P.2d 1239, 1243 (1982) (because damage to reputation is "essence and gravamen" of defamation action, plaintiff must show injury to reputation to establish claim for defamation); *Salomone v. MacMillan Pub. Co.*, 77 A.D.2d 501, 429 N.Y.S.2d 441, 443 (1980); *France v. St. Clare's Hosp. & Health Ctr.*, 82 A.D.2d 1, 441 N.Y.S.2d 79, 82 (1981). *See generally* Annotation, *Proof of Injury to Reputation as Prerequisite to Recovery of Damages in Defamation Action—Post–Gertz Cases*, 36 A.L.R.4th 807, 811 (1985 & Supp.1994) (noting states that require proof of harm to reputation for defamation claims). *See, e.g.,* Joel D. Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va. L.Rev. 1347 (1975).

Here, the majority inadvisably relies on the doctrine of defamation per se to permit appellants to survive summary judgment. But the purpose of summary judgment is "to separate the wheat from the chaff and relieve the court system of the burden and expense of unfounded litigation." *Cook v. Connolly*, 366 N.W.2d 287, 292 (Minn.1985).

My second reason for dissent is that, even if there is room in Minnesota law for defamation per se, the doctrine is inappropriately applied in this case. The Maury Povich show specifically identified the offenders by name, clearly establishing that they were not appellants. In the face of that identification, appellants should be required to show that someone nonetheless mistakenly understood appellants to have been the offending parties. Because appellants failed to make such a showing, per se defamation was unavailable

to defeat summary judgment. Its application was inappropriate.