James RICHIE, et al., Respondents,

v.

PARAMOUNT PICTURES CORPORA-
TION, et al., Petitioners, Appellants
(CX–94–2249), Defendants (C5–94–2501),

Hubbard Broadcasting, Inc., d/b/a KSTP,
et al., Defendants (CX–94–2249),

Kathy Tatone, Petitioner, Appellant
(C5–94–2501).

Nos. CX–94–2249, C5–94–2501.

Supreme Court of Minnesota.

Feb. 23, 1996.

John P. Borger, Eric E. Jorstad, Faegre & Benson, Minneapolis, and Bruce Pottash, Christine Cunningham, Los Angeles, CA, for appellants Paramount Pictures Corporations and MoPo Productions.

Lewis A. Remele, Jr., Kevin P. Hickey, Minneapolis, for appellant Kathy Tatone.

Tyrone P. Bujold, Robert J. Gilbertson, Minneapolis, for respondents.

---

**1.** Hubbard Broadcasting, which broadcast the Show within Minnesota, was also originally named as a defendant. However, claims against Hubbard were dismissed with prejudice by stipulation dated August 25, 1993.

## OPINION

TOMLJANOVICH, Justice.

James Richie and Karen Gerten commenced this action in May of 1993 alleging defamation and false light invasion of privacy. These charges were based upon a photograph shown during the November 5, 1992 telecast of The Maury Povich Show (the Show), a nationally syndicated television program. Appellant, Paramount Pictures Corp. (Paramount), produced the Show and employed the personnel who obtained the photograph and incorporated it into the Show. Appellant, Kathy Tatone, provided the photograph to the Show. Appellant, MoPo Productions Inc. (MoPo), provided the services of host Maury Povich to the Show, but Povich himself was not aware that a photograph was being used in connection with the segment of the Show in question.[1]

On July 12, 1994, Hennepin County District Court granted summary judgment in favor of Paramount and MoPo on both the defamation and privacy claims. On November 17, 1994, the court granted summary judgment in favor of Tatone on both claims. However, on May 30, 1995, the court of appeals reversed the trial court and remanded the case for trial. *Richie v. Paramount Pictures Corp.*, 532 N.W.2d 235 (Minn.App. 1995). This court granted review on July 20, 1995.

In September of 1992, attorney Kathy Tatone represented Denise Richie in a successful civil case against her parents arising out of sexual abuse by Denise's father, Dennis Richie. Denise also obtained a favorable verdict against her mother, Lynnell (also spelled "Lanell") Richie, for negligently failing to take any action to prevent the abuse.

Following the verdict, a producer for the Maury Povich Show contacted Tatone regarding an appearance on that program by Tatone and Denise Richie. Tatone negotiated and entered into a legal agreement with the Show regarding the terms of the appearance. Shortly before the program was scheduled to be taped, the Show requested

photographs of Denise Richie and her parents. Tatone contacted Denise Richie to obtain approval to use photographs for the Show and to discuss with Denise what photographs should be used. Denise Richie had provided Tatone with a family photo album in connection with the trial. Denise suggested that Tatone look through the album and find a picture of her in a graduation gown with her parents. Tatone found a single picture in which Denise Richie was standing in a gown between an adult male and female. Tatone provided this and one other photograph to the Show's producers.

The program was broadcast on November 5, 1992. The Show's producers displayed the photo of Denise Richie in her graduation gown standing between two adults. The two adults standing next to Denise Richie, however, were not Denise's parents, but her godparents,[2] Karen Gerten and James Richie. The photo was displayed at various times during the broadcast including times coinciding with Denise Richie's description of the sexual abuse perpetrated against her by her father. Gerten and Richie, however, were never identified by name; the names of Denise's parents were used throughout the Show. Also, with Gerten and Richie's permission, a retraction was aired by the Show a few weeks after the broadcast. Neither Karen Gerten nor James Richie saw their pictures used during the original telecast. Each learned later, however, of the Show from family or friends and eventually each watched a videotape of the interview.

After viewing the tape, Richie stated that he was "shocked," "humiliated," "blown away," and felt "just crushed" and "very sick" about the broadcast. Richie also testified that:

I don't take this lightly. I put up with sexual abuse when I was a child in my home. My father sexually abused my sister * * *. The whole thing was so distasteful for me, you know, and——I don't want to go back and live my childhood over again for anything. When I left the house and I started doing my own life and being a different person, then, you know, that was a great thing to me. And now how

many years later, all of a sudden now Denny commits these crimes and through someone's careless mistake or some bunch of people's careless mistake, you know, all of a sudden now I'm thrust back into a situation, you know. That has caused me a great deal of emotional pain since I was a child * * * it * * * affect[s] me a lot and I * * * think about it every day.

Gerten also testified concerning how the broadcast affected her:

[I was] embarrassed by having that shown, that I was the mother of someone who was sexually molested by her dad and that I thought it was okay. When I thought about it, I would get sick to my stomach and——emotionally, it was very upsetting * * *.

[W]hen people would look at you, you would wonder if they saw the show, you know, are they staring at me because they saw the show * * *. It was always on my mind. It was upsetting and embarrassing. You're already ashamed that it's even been involved in your family and then you're portrayed as the one who condoned it. I guess I have to say that emotionally I was really, I guess you would say, a basket case.

Finally, both Gerten and Richie testified that they will never know whether people saw the broadcast or think ill of them because of it. The trial court found that neither Karen Gerten nor James Richie have lost any income or incurred any other special damages as a result of the broadcast.

On July 12, 1994, the trial court granted summary judgment for appellants MoPo and Paramount. The court found that Gerten and Richie did not show sufficient harm to reputation to sustain a defamation claim, and that harm to reputation could not be presumed. Additionally, the court found that the emotional harm shown by them could not support a defamation claim. Finally, MoPo and Paramount had argued that New York law should apply to their case essentially because the broadcast originated in New York. The trial court, however, declined to hold on the choice of law issue because it

---

**2.** Respondents have also been referred to as Denise Richie's maternal aunt and paternal uncle.

found that under either state's law, it would grant summary judgment.

On November 17, 1994, the trial court granted summary judgment for Kathy Tatone. It found that Tatone's communication was privileged by either the qualified immunity protecting an attorney from liability to third parties for actions arising out of the attorney-client relationship, or by a qualified privilege for statements made on a proper occasion for a proper motive. It further found that Tatone was not liable for defamation because "allowing recovery for emotional distress damages in a defamation action without injury to reputation would, in effect, convert defamation into false light invasion of privacy," and Minnesota has rejected the latter cause of action.

In a split decision, the court of appeals reversed. The majority found that no privilege applied to Tatone. *Richie,* 532 N.W.2d at 243 (Minn.App.1995). The court also found that harm to reputation could be presumed for purposes of summary judgment. *Id.* at 240. Finally, the court held that Minnesota law was applicable to the case. *Id.* at 242.

Tatone appeals the court's findings regarding privileges for defamation and presumed harm in a defamation action. MoPo and Paramount appeal the court's findings regarding presumed harm and choice of law.

■ On appeal from summary judgment, the reviewing court asks whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). Further, the trial court's "findings of facts, whether based on oral or documentary evidence, shall not be

set aside unless clearly erroneous * * *." Minn. R. Civ. P. 52.01.

■ In Minnesota, the elements of defamation "require the plaintiff to prove that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation and to lower him in the estimation of the community." *Rouse v. Dunkley & Bennett, P.A.,* 520 N.W.2d 406, 410 (Minn.1994). It is the final element of this cause of action that is in dispute in this case.

■ Harm to reputation can, of course, be proven by direct evidence. Moreover, in cases of defamation per se,[3] the common law allowed harm to reputation to be presumed. *See Becker v. Alloy Hardfacing & Engineering Co.,* 401 N.W.2d 655, 661 (Minn.1987). However, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the U.S. Supreme Court held that in a private plaintiff[4] defamation action against a media defendant speaking on a matter of public concern, states may not constitutionally "permit recovery of presumed * * * damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349, 94 S.Ct. at 3011; *see also Jacobson v. Rochester Communications,* 410 N.W.2d 830, 836 n. 7 (Minn.1987); *Jadwin v. Minneapolis Star & Tribune Co.,* 367 N.W.2d 476, 492 (Minn. 1985). The Court reached this conclusion through balancing the "need for a vigorous and uninhibited press" reflected in the First Amendment with a strong and "legitimate state interest in compensating private individuals for wrongful injury to reputation * * * ." *Gertz* at 342 and 348, 94 S.Ct. at 3008 and 3011. The Court went on to state that "[i]t is necessary to restrict defamation plaintiffs who do not prove knowledge of

---

3. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112, at 795 (5th ed. 1984) defines defamation per se to be

    actionable without the necessity of pleading and proving that the plaintiff had suffered any impairment of his reputation or other harm as a result. In other words, the existence of damage [is] conclusively presumed or assumed from the publication of the libel itself, without any evidence to show actual harm of any kind. "Among those types of actions which are defamatory per se are false accusations of committing

a crime * * * ." *Becker,* 401 N.W.2d at 661. Also, "[a] statement is defamatory per se if it imputes serious sexual misconduct to the subject of the statement." *Baufield v. Safelite Glass Corp.,* 831 F.Supp. 713, 717 (D.Minn.1993); *see also* Restatement (Second) of Torts § 559–570 (1977).

4. That is, a plaintiff that is neither a public figure nor a public official.

falsity or reckless disregard for the truth to compensation for actual injury." *Gertz* at 349, 94 S.Ct. at 3012.

In the current case, the defamation occurred during a discussion of sexual abuse of children by their parents and legal recourse available to the abused child. ·Such matters are certainly of public concern and were publicized by Paramount, MoPo and Tatone[5] via the television media. Additionally, there are no allegations of actual malice. Nonetheless, the court of appeals found that recovery could be based on presumed damages. *Richie* at 239–40. We find this holding to be in contravention of the Supreme Court's holding in *Gertz*. In a case such as this, where the defamatory statements were made by the media, involved a matter of public concern, and there have been no allegations of actual malice, recovery cannot be based on presumed damages. Therefore, to successfully litigate their defamation claim, plaintiffs must demonstrate actual damages.

This requirement does not change because plaintiffs might be attempting only to survive a summary judgment motion. The court of appeals stated that "[a]t least 'some' actual injury to [respondents] reputations can be assumed from the seriousness of [the] false statement seen on national TV, *at least enough to survive a motion for summary judgment.*" *Richie* at 240 (emphasis added).

We disagree. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), the U.S. Supreme Court stated that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." As discussed above, the "substantive evidentiary burden" in this case requires that Gerten and Richie show actual harm. Thus, we hold that, absent allegations of actual malice, in order to survive a summary judgment motion in a defamation action concerning statements made by the media and involving a matter of public concern, there

must be a genuine issue of material fact as to whether Gerten and Richie suffered actual harm; damages cannot be presumed.

Neither Gerten nor Richie argue to this court that they should survive summary judgment based on presumed harm to reputation. Rather, they claim that they have suffered demonstrable harm to their reputations. Gerten and Richie cite "several inquiries [Richie received] from family and friends regarding his involvement with the abuse and criminal trial described in Maury Povich's interview." Richie also testified that an employee at a Hardee's restaurant in Eden Prairie who was usually "pretty nice," gave him the "cold shoulder" and, approximately a year after the broadcast, the restaurant served him three cheeseburgers that were all raw. Finally, both respondents argue that they "have come to understand they will never know whether people saw the broadcast or think ill of them because of it."

The trial court, however, found that neither Gerten nor Richie suffered actual damages to his or her respective reputation. Regarding Richie, the trial court stated:

> Richie has lost no income as a result of the broadcast, and he has incurred no expenses to mitigate, correct or counteract the broadcast, aside from this suit. No one has indicated to him that they think less of him because of the broadcast. No one has indicated to Richie that they thought he was one of Denise Richie's parents or was involved actively or passively in Denise Richie's abuse. There has been no change in the behavior of those he regularly encounters as a Xerox service representative.

With respect to Gerten, the court found:

> In the more than one year between the broadcast and Gerten's deposition, only [two people, who knew the photos were a mistake] contacted her about the show; no one else has contacted her or told her they watched the show.

> *Law of Torts,* § 112 at 796 (stating that presumed damages cannot be recovered in defamation actions "at least against the press or broadcast media *and those who utilize these means*" unless actual malice is shown) (emphasis added).

---

5. Because Tatone's communication utilized the television media, we place her in the same legal position with respect to Gerten and Richie's claims as we place Paramount and MoPo. *See,* W. Page Keeton et al., *Prosser and Keeton on the*

In addition, the show had no effect on her work. She has lost no income, incurred no expense and taken no steps to mitigate, correct or counteract the broadcast, aside from this suit. No one has told Gerten they thought less of her because of the broadcast, and she can point to no specific facts demonstrating that her reputation has been affected. Finally, she has heard no rumors in her home community * * * as a result of the broadcast.

These findings were based on deposition testimony of Gerten and Richie and are not clearly erroneous. We conclude that neither Gerten nor Richie demonstrated that there is a material question of fact as to whether either of them suffered sufficient harm to their respective reputations to support a defamation claim.

Both Gerten and Richie, however, argue that even if they have not shown sufficient actual harm to their reputations, they should be allowed to recover for damages based on mental anguish and humiliation. It is generally the case that once a defamation claim is established, damages for wounded feelings and humiliation are recoverable as "parasitic" damages. *Prosser* states:

> [O]nce the cause of action is established, either by the character of the defamation itself or by the proof of pecuniary loss, the bars are lowered, and "general" damages may be recovered for the injury to the plaintiff's reputation, his wounded feelings and humiliation, and resulting physical illness and pain, as well as estimated future damages of the same kind. In other words, such damages are insufficient in themselves to make the slander actionable, but once the cause of action is made out without them, they may be tacked on as "parasitic" to it.

*W. Page Keeton et al., Prosser and Keeton on the Law of Torts* § 112, at 794–95 (5th ed. 1984).

While *Gertz* did require a plaintiff to demonstrate actual harm, it did not mandate that the actual harm be to reputation. That is, while actual damages are required in a defamation action of the type before us, there is no constitutional prerequisite that damages be based on *reputational* harm. In *Gertz*, the Court stated: "[s]uffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id.* at 350, 94 S.Ct. at 3012.

Indeed, two years after *Gertz*, in *Time, Inc. v. Firestone*, 424 U.S. 448, 460, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976), the Supreme Court allowed recovery in a defamation action to be based on elements other than injury to reputation. In *Firestone* the Court stated:

> In [*Gertz* ] we made it clear that States could base awards on elements other than injury to reputation, specifically listing "personal humiliation, and mental anguish and suffering" as examples of injuries which might be compensated consistently with the Constitution upon a showing of fault. Because respondent has decided to forgo recovery for injury to her reputation, she is not prevented from obtaining compensation for such other damages that a defamatory falsehood may have caused her.

*Firestone* at 460, 96 S.Ct. at 968. Thus, there is no constitutional bar to recovery for a defamation claim based solely on emotional damages.

The question, then, becomes whether Minnesota allows defamation claims based exclusively on mental anguish and humiliation. This court has never squarely addressed this issue. However, Gerten and Richie argue that Minnesota law "imposes no prerequisite of reputational harm on recovery of actual damages." They cite *Jadwin*, 367 N.W.2d at 491–92 (Minn.1985) and *Becker*, 401 N.W.2d at 655 (Minn.1987) in support of their argument.

*Jadwin*, however, primarily involved the issue whether the plaintiff was a public figure for purposes of a libel action and the commensurate standard of fault. This court merely acknowledged that "[a]s required by *Gertz*, a private plaintiff may only recover compensation for actual injury * * *." *Jad-*

*win* at 491–92. Gerten and Richie then point out that, under *Gertz,* "actual injury" may include personal humiliation and mental anguish and suffering. While this may be, nothing in *Gertz required* that emotional harm be found sufficient to support recovery in a defamation claim. Thus, *Jadwin* neither supports nor defeats Gerten and Richie's argument.

*Becker* is also inapplicable to the present case. *Becker* allowed general damages based on a defamation per se claim. *Id.* at 661. However, the case involved a private plaintiff suing a private defendant on a matter that was not of public concern. *Id.* Thus, the First Amendment limitations to defamation claims laid down in *Gertz* were inapplicable to *Becker.* However, as explained above, that is not the situation here. Thus, *Becker* is not controlling in the present circumstances.

Gerten and Richie also quote language from *State Farm Mut. Auto. Ins. Co. v. Village of Isle,* 265 Minn. 360, 122 N.W.2d 36 (1963), *Larson v. Chase,* 47 Minn. 307, 50 N.W. 238 (Minn.1891), and *Langeland v. Farmers State Bank of Trimont,* 319 N.W.2d 26 (Minn.1982) to support their argument. However, both *Village of Isle* and *Langeland* only state that except in cases such as defamation, physical injury is required before recovery for mental anguish could be sustained. Additionally, in *Larson,* Justice Mitchell simply pointed out that some right of the plaintiff must be violated before recovery for emotional damage would be allowed. None of the cases in any way stated that emotional harm alone, unaccompanied by harm to reputation, could sustain a defamation claim.

▇▇▇▇ Tatone, Paramount and MoPo, on the other hand, argue that a showing of actual harm to reputation should be required before a defamation action can be sustained.

We agree. This court has consistently acknowledged that the purpose of a defamation action is to "compensat[e] private individuals for wrongful injury to reputation." *See, e.g., Jadwin,* 367 N.W.2d at 480 (Minn.1985).

Further, this court has exercised "historical caution regarding emotional distress claims." *K.A.C. v. Benson,* 527 N.W.2d 553, 559 (Minn.1995). *See, e.g., Garvis v. Employers Mutual Casualty Co.,* 497 N.W.2d 254, 257 n. 3 (Minn.1993) ("Emotional distress is highly subjective, often transient, and easily alleged."). While neither *K.A.C.* nor *Garvis* involved a defamation claim, we see nothing inherent in such a claim that should inhibit our caution.

▇▇▇▇ Finally, while defamation focuses on injury to reputation, it is invasion of privacy torts [6] that compensate for "mental distress from having been exposed to public view." *Time Inc. v. Hill,* 385 U.S. 374, 384–85 n. 9, 87 S.Ct. 534, 540–41 n. 9, 17 L.Ed.2d 456 (1967). Thus, to allow emotional harm to form the basis for liability in a defamation action would be the practical equivalent of allowing a plaintiff to bring an invasion of privacy claim. However, this court "has never recognized, either by legislative or court action, a cause of action for invasion of privacy, even though many other states have done so." *Hendry v. Conner,* 303 Minn. 317, 226 N.W.2d 921, 923 (1975) To allow emotional harm as the basis of a defamation action would be inconsistent with this court's rejection of invasion of privacy claims. Thus we hold that in a defamation suit, emotional damages are not compensable absent harm to reputation.[7]

Having decided that Minnesota law imposes a reputational harm prerequisite in defamation actions, we must now address whether Minnesota law applies in this action. Because the Show was taped and

---

6. *Prosser* notes that there are four separate kinds of invasion of privacy: (1) appropriation for the defendant's benefit or advantage of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's physical solitude or seclusion; (3) publicity which places the plaintiff in a false light in the public eye; and (4) public disclosure of private facts. *Id.* § 117 at 851–66.

7. We note that we are not the only jurisdiction to so hold. Other jurisdictions have also imposed a reputational harm prerequisite in defamation actions. *See, e.g., Garziano v. E.I. DuPont De Nemours & Co.,* 818 F.2d 380, 395 (5th Cir.1987) (applying Mississippi law); *Little Rock Newspapers, Inc. v. Dodrill,* 281 Ark. 25, 660 S.W.2d 933, 936–37 (1983); *Gobin v. Globe Publishing Co.,* 232 Kan. 1, 649 P.2d 1239, 1243 (1982).

broadcast from New York, Paramount and MoPo contend that New York law should apply. However, because we find that the outcome of this action would be the same regardless of whether we applied Minnesota or New York law, we can dispose of this issue without engaging in a full blown choice of law analysis.

In determining whether the forum state's or a foreign state's law applies, a threshold consideration is whether "the choice of one state's law over another's creates an actual conflict." *Jepson v. General Cas. Co. of Wisc.*, 513 N.W.2d 467, 469 (Minn. 1994). In this case, such a conflict would arise if New York law did not impose a reputational harm prerequisite in defamation actions.[8]

The court of appeals found New York law to be unsettled on the issue of a reputational harm prerequisite. *Richie*, 532 N.W.2d at 240, n. 3. While we agree that New York law is muddled in this area, we find that even if we were to decide that New York law applied, we would still impose a reputational harm prerequisite. Applying *Gertz*, *France v. St. Clare's Hospital and Health Ctr.*, 82 A.D.2d 1, 441 N.Y.S.2d 79 (N.Y.App.Div.1981), and *Salomone v. Mac-Millan Publishing, Inc.*, 77 A.D.2d 501, 429 N.Y.S.2d 441 (N.Y.App.Div.1980), specifically held that in a defamation action, claims for emotional distress are not compensable absent damage to reputation. *France*, 441 N.Y.S.2d at 82; *Salomone*, 429 N.Y.S.2d at

443. However, two later cases, *Matherson v. Marchello*, 100 A.D.2d 233, 473 N.Y.S.2d 998 (N.Y.App.Div.1984) and *Hogan v. Herald Co.*, 84 A.D.2d 470, 446 N.Y.S.2d 836 (N.Y.App. Div.1982), *aff'd* 58 N.Y.2d 630, 458 N.Y.S.2d 538, 444 N.E.2d 1002 (1982), found that allegations of both reputational and emotional harm "sufficiently claim actual injuries" to survive a summary judgment motion. *Id.*, 446 N.Y.S.2d at 843.

Nonetheless, we find that neither *Hogan* nor *Matherson* are as unequivocal about the absence of a reputational harm prerequisite as *France* and *Salomone* are about its existence. In *Hogan*, the plaintiff was not claiming only emotional harm, but was also claiming harm to reputation. Thus, *Hogan* did not directly address the question of a reputational harm prerequisite as both *France* and *Salomone* did. Further, while *Matherson* does limit the holdings of both *France* and *Salomone*, we do not read *Matherson* as completely abrogating those two cases' imposition of a reputational harm prerequisite.[9]

Respondents also cite to *Pirre v. Printing Developments, Inc.*, 468 F.Supp. 1028 (S.D.N.Y.1979) and *Guccione v. Hustler Magazine, Inc.*, 632 F.Supp. 313 (S.D.N.Y. 1986) in support of the absence of a reputational harm prerequisite in New York. However, following both cases, the Second Circuit decided *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2nd Cir.1987), in which the court stated that "New York does not permit compensatory damages to be recov-

8. As the court of appeals points out, if this case were to be remanded for trial, the question of the standard of proof in a defamation action by a private plaintiff would create an actual conflict. Minnesota applies a negligence standard, *Jadwin* at 492, and New York, a gross irresponsibility standard, *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 63–5, 341 N.E.2d 569, 571 (1975). However, because this appeal disposes of all the issues in this case without remand, no "actual" conflict is created by this difference in law.

9. In *Matherson*, the court stated that "we find that the cases which require a plaintiff to plead special damages, establish * * * actual malice, or suffer dismissal of the complaint (e.g. [citing *France* and *Salomone*]), cut far too broadly and their analysis has been rejected by the Court of Appeals." *Matherson*, 473 N.Y.S.2d at 1003. In

*Matherson*, special damages were defined to be " 'the loss of something having economic or pecuniary value' * * * which 'must flow directly from the injury to reputation caused by the defamation, not from the effects of defamation.' " *Id.*, 473 N.Y.S.2d at 1000 (citations omitted). Thus, *Matherson*, could be read to have specifically rejected the reputational harm prerequisite of *Salomone* and *France*.

However, *Matherson* rejected only the requirement that a plaintiff plead *special* damages to support a defamation action. Thus, given the definition of special damages, *Matherson* could be read as rejecting only the necessity of finding *pecuniary* damage flowing from harm to reputation, not a general showing of some harm to reputation such as lowering of esteem in the eyes of the community. Therefore, *Matherson* could be read as not rejecting the reputational harm prerequisite erected in *France* and *Salomone*.

ered absent proof of injury to reputation or malice." *Id.* at 926–27. We read this as overruling any contrary holdings in either *Pirre* or *Guccione.*

Finally, courts in other jurisdictions have found that New York does have a reputational harm prerequisite in defamation cases. *See, e.g., Little Rock Newspapers, Inc. v. Dodrill,* 281 Ark. 25, 660 S.W.2d 933, 936–37 (1983); *Gobin v. Globe Publishing Co.,* 232 Kan. 1, 649 P.2d 1239, 1243 (1982).

For these reasons, we find that whether we apply New York or Minnesota law in this case, we would impose a reputational harm prerequisite. Thus, for purposes of this appeal, no actual conflict exists between the law of the two states and we therefore need not reach the issue of which law should be applied.

We are now in a position to decide the matter at hand. We have determined that it would violate the First Amendment to allow Gerten and Richie to recover based on pre-

sumed damage to their reputations. We have also held that respondents' defamation claim cannot succeed based only on humiliation or other types of emotional harm. Thus, respondents must be able to show actual harm to their reputations. Because the trial court was not clearly erroneous in finding that neither Gerten nor Richie suffered actual harm to their reputations, we hold that neither Gerten's nor Richie's defamation action can succeed. We therefore reinstate the trial court's orders granting summary judgment to appellants Tatone, Paramount and MoPo.

Reversed; trial court judgment reinstated.