**Robert P. WILLIAMS, Respondent,**

v.

**PULITZER BROADCASTING CO. and Chris Condon, Appellants.**

No. 49425.

Missouri Court of Appeals,
Eastern District,
Division Two.

Jan. 28, 1986.

Motion for Rehearing and/or Transfer Denied Feb. 25, 1986.

Application to Transfer Denied April 15, 1986.

Lewis & Rice, Robert B. Hoemeke, Richard A. Wunderlich, Joseph E. Martineau, St. Louis, for appellants.

W.T. Nolan, Stuart M. Haw, Anderson, Gilbert, Wolfort Allen & Bierman, St. Louis, for respondent.

CRIST, Judge.

Defendants Chris Condon and Pulitzer Broadcasting Company (KSDK) appeal from a judgment entered pursuant to a jury verdict awarding plaintiff actual dam-

ages of $100,000 against both defendants, and punitive damages of $2,500 against defendant Condon and $1,000,000 against defendant KSDK, on his claim for libel. We affirm in part, and reverse in part.

KSDK, owner and operator of KSDK–TV Channel 5 in St. Louis, employed reporter Chris Condon. Condon was covering the activities of Special Aldermanic Committee on Health and Hospitals, a committee of the Board of Aldermen of St. Louis, during 1978 and 1979. Most of the committee's hearings and meetings occurred in the Soldier's Memorial Building in downtown St. Louis. During one of these meetings, Condon received information regarding a Robert Williams. Most of this information was later demonstrated to be false, but Condon was unaware of its falsity at the time.

Specifically, Condon was informed the committee was going to subpoena one Robert Williams, who was suspected of holding and receiving pay for two city jobs, which was illegal. Also, Williams supposedly had been convicted of theft, allegedly from the city. The check for the second city job was alleged to be a pay-off for "taking the rap" for someone else on the theft charge. Condon was aware two other Robert Williams had been subpoenaed before the committee, and neither was the person the committee sought. However, he was assured that this time the committee had the right man.

The defamatory telecasts were broadcast at 6:00 p.m. and 10:00 p.m. on August 18, 1978. The segment on the 6:00 p.m. telecast began with KSDK employee Patrick Emory, the "anchorman," introducing the report:

> The investigation of the city hospitals in St. Louis led by Alderman Freeman Bosley has turned up the intriguing case of one Robert P. Williams. Williams has been drawing two city salaries, which is against the law, but that is only the beginning. Chris Condon has more.

Following this "lead-in" came Condon's videotaped report. The video portion of this report (which was reconstructed by oral testimony, as all videotapes of the story had been routinely erased prior to the suit) shows Condon holding the checks which allegedly show that Williams was holding two city jobs at one time. The testimony conflicted as to whether the shot of Condon holding the checks occurred at Williams' home or at another place. Then the video went to a shot of Williams' residence, with a caption superimposed on the picture identifying it as such and giving the address. Condon was shown knocking on the door, and getting no answer.

In the audio portion of the report, Condon stated Williams was a convicted felon, who had been put on probation after pleading guilty to stealing from City Hospital, and who held two city jobs at one time. He said the checks were a pay-off for "taking a rap for somebody" and Williams would have to answer to an Aldermanic Committee in the next week or so.

The 10:00 p.m. telecast was similar. Anchorman Emory's lead-in stated:

> Aldermanic investigators have uncovered the case of a convicted thief who has held two city jobs at one time. He is Robert P. Williams. Williams was put on probation, after pleading guilty to stealing from City Hospital. Chris Condon has the details.

A slightly shorter version of Condon's videotaped report containing the same information as that broadcast at 6:00 p.m. followed.

■ Appellants do not contend the broadcasts were not defamatory. Rather, it is claimed the statements Williams was a convicted felon and a convicted thief were privileged because they were contained in "a report of statements made by the chairman and investigator of an Aldermanic Committee during a committee meeting." If so, appellants' publication of the admittedly defamatory statement would be privileged under the rule of Restatement (2nd) of Torts § 611 (1976):

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the

**511**

report is accurate and complete or a fair abridgment of the occurrences reported. Missouri has adopted this rule. *Shafer v. Lamar Publishing Company*, 621 S.W.2d 709 (Mo.App.1981). Here the privilege fails only when the report is not a fair and accurate account of the proceedings of the Aldermanic Committee. *Restatement* § 611, comment f.

■ A defendant who asserts the privilege has the burden of establishing its applicability. *Estes v. Lawton-Byrne-Bruner Insurance Agency Co.*, 437 S.W.2d 685, 691 [3] (Mo.App.1969); *Restatement* § 613(2). Whether the circumstances proven give rise to the privilege is a matter consigned to the trial judge, and is not to be submitted to the jury. *Estes*, 437 S.W.2d at 691 [2]; *Restatement* § 619(1). We conclude the trial court was correct in finding the privilege did not attach. Appellants have failed to show the story was in fact a report of public proceedings so as to give rise to the privilege.

The 6:00 p.m. telecast report began with Anchorman Emory, shown in the KSDK–TV Studio, stating "The investigation of the city hospitals in St. Louis led by Alderman Freeman Bosley has turned up the intriguing case of one Robert P. Williams." No statements were ever attributed to Alderman Bosley, any other alderman or any aldermanic investigator. Rather, all Emory said was that Williams had been drawing two salaries, and "that is only the beginning. Chris Condon has more." With that, the telecast switched to the Condon videotape, in which the only reference to any alderman or aldermanic body was the assertion Williams would have to answer to the committee in the next week or so. The clear thrust of the story was the committee had come up with the Williams case, and that Condon had "more;" that Williams was a convicted felon. Condon went to his home to lend a dramatic impact to the story. The "sting" of the libel, therefore, was attributed to Condon and not the committee. Only twice in the report were the aldermen even mentioned; once in Emory's "lead-in," and once in the statement Williams would have to answer to the aldermanic committee in a week or so. It appears the video portion of the telecast did not suggest any other connection with the aldermen. The story, as telecast, was not a story concerning aldermanic proceedings; rather, it was about Robert P. Williams, the "convicted thief."

On the 10:00 p.m. report, Emory led in from the studio with the statement "aldermanic investigators have uncovered the case of a convicted thief who has held two city jobs at one time." This statement was not connected with any specific alderman or committee, nor was any information given as to how or when this information was made public. Instead, he simply went on to give the "thief's" name, and say "Chris Condon has the details," which were contained in a slightly shortened version of the videotape report broadcast at 6:00 p.m. Once again, we have a story concerning Williams, and not a story concerning aldermanic proceedings.

■ We assume a statement of the reasons underlying the issuance of the aldermanic subpoena to Williams would in fact be subject matter covered by the privilege. *But See Restatement* § 611, comment h. However, to be privileged, the news items in question must purport to be a report of a proceeding which is entitled to be covered by the privilege. See *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C.App.1980); *Curtis Publishing Company v. Vaughan*, 278 F.2d 23, 29 (D.C.Cir.1960). Otherwise, the statements become the unprivileged statements of the publisher, and not the privileged statements of the committee. Here, the story is reasonably susceptible to only one meaning; that aldermanic investigators discovered Williams and the two jobs he apparently held, and Condon had "more." This is reinforced by the statement of Condon that Williams would have to answer to the Aldermen within a week, which clearly conveys the message these charges were new to the board, and they would be investigated at that time. We cannot say the court erred in finding the report privilege inappli-

cable. And, as the report privilege was inapplicable, the court also did not err in refusing to instruct the jury on abuse of that privilege.

However, appellants properly assert that Williams failed to make a submissible case for punitive damages. Although actual damages could be awarded to Williams, conceded to be a private figure, on a finding of "fault" on the part of the publisher, punitive damages could only be awarded on a finding of actual malice, which is defined as publication of the defamatory matter with either knowledge of, or reckless disregard of, the falsity of the information published. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974); *New York Times, Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It is conceded Condon had no actual knowledge of the falsity of the statements. Therefore, Condon must be demonstrated, by clear and convincing evidence, to seriously and consciously doubt the truth of the information at the time it was published. *Bose v. Consumers' Union of the United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 1965, N. 30, 80 L.Ed.2d 502 (1984). The evidence in this case was insufficient to make this demonstration.

Williams relied on five factors to show reckless disregard for the truth. He claims the information was (1) false and obviously defamatory in nature, (2) acquired from a source which was political and therefore inherently unreliable, and which had been wrong twice before on this very point, (3) broadcast without further investigation, even though the statements could have been easily checked at a location very close to Soldier's Memorial and the location of the Channel 5 studios, and (4) the story was not "hot news" such that there was a necessity for immediate broadcast without investigation. In addition, Williams points to the fact the amount of Channel 5's revenue is directly related to the number of people that watch its broadcasts. However, Williams does not show any tenable connection between the quest for revenue by Channel 5 and the broadcast of false information.

First, proof of falsity is not also proof of malice. *Bose*, at 485, 104 S.Ct. at 1965. Further, malice is not shown by either the defamatory nature of the charges or the failure to investigate alone. *Shafer*, 621 S.W.2d at 714. The source cannot be considered unreliable. While plaintiff's evidence did establish a general scepticism towards political sources, nowhere does the evidence show an "obvious reason[s] to doubt the veracity of the informant." *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968); *Compare Stevens v. Sun Publishing Company*, 270 S.C. 65, 240 S.E.2d 812, 815 (1977) (writer recognized source's bias). The fact two other city employees with the same name had previously been subpoenaed to appear before the committee did not give Condon a reason to seriously doubt the accuracy of the information, especially given the committee's assurance that, this time, the committee had the right man.

We believe the evidence in the record does not clearly and convincingly show Condon or KSDK–TV consciously had serious doubts as to the truth of the material broadcast. Therefore the punitive damage award must be reversed. In light of the disposition of the punitive damage issue, appellant's points IV, VII, and so much of point V as is related to the punitive damages issue become moot.

In the remainder of Point V, appellants complained about the amount of actual damages awarded by the jury. We believe the record contains ample evidence to support an award of $100,000. The judgment for this amount is supported by substantial evidence and is not against the weight of the evidence. No error of law appears. An extended opinion in reference to this point would have no precedential value. This point is affirmed in accordance with Rule 84.16(b).

We have also reviewed the assertions of instructional error contained in Point VI of Appellant's brief. The instructions com-

plained of comply fully with M.A.I. We also affirm this point in accordance with Rule 84.16(b).

The judgment awarding plaintiff $100,-000 in actual damages is affirmed. The judgment awarding plaintiff $2500 punitive damages against defendant Condon and $1,000,000 punitive damages against defendant KSDK is reversed.

DOWD, P.J., and SNYDER, J., concur.