**George ENGLEZOS and Aesop, Inc., Appellant–Respondent,**

v.

**THE NEWSPRESS AND GAZETTE COMPANY, a Missouri Corporation, and Terry Raffensperger, Respondent–Appellant.**

**No. WD 54143.**

Missouri Court of Appeals,
Western District.

Sept. 1, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 27, 1998.

Application for Transfer Denied Dec. 22, 1998.

James M. Yeretsky, Brian G. Boos, Yeretsky & Maher, L.L.C., Kansas City, for Appellant–Respondent.

Wendell E. Koerner, Jr., St. Joseph, for Respondent–Appellant.

Before HANNA, P.J., and LAURA DENVIR STITH and HOWARD, JJ.

LAURA DENVIR STITH, Judge.

Appellant St. Joseph News–Press & Gazette appeals the jury's verdict awarding George Englezos $20,000 in damages for defamation based on an article about Mr. Englezos which the News–Press published and which was later determined to have been inaccurate in large part. Mr. Englezos cross-appeals the trial court's direction of a verdict for the News–Press on the issue of punitive damages. We find that the trial court properly submitted the actual damage issue to the jury pursuant to an instruction allowing the jury to find liability based on fault or negligence on the part of the News–Press. We reject the News–Press' argument that actual malice was required to prove defamation in this case, which does not involve a public figure. We also affirm the trial court's direction of a verdict for the News–Press on the issue of punitive damages. Plaintiff was required to offer clear and convincing evidence of actual malice in order to submit punitive damages. He showed only a failure to adequately investigate, and other negligence, and this cannot support submission of punitive damages. Accordingly, the judgment is affirmed.

## I. FACTUAL AND PROCEDURAL HISTORY

On February 10, 1994, an article written by Terry Raffensperger entitled "Bistro Blues Closes Amid Contention," was published in the St. Joseph News–Press & Gazette. It was accompanied by photographs of Ken Shearin (the owner of Bistro Blues) and George Englezos (the operator of Bistro Blues). It stated, in its entirety:

Bistro Blues, a popular downtown restaurant at 817 Francis St., appears to have died an ugly death.

Restaurant operator George Englezas (sic) unexpectedly closed the restaurant Friday afternoon after putting up a sign saying he was going on vacation until March.

On Saturday, Englezas tried to leave town in a rented truck full of equipment and supplies belonging to Bistro Blues, owner Ken Shearin confirmed Wednesday.

Shearin, who founded Bistro Blues six years ago, was in Atlanta attending a convention Saturday. Shearin leased the business to Englezas, a Greek national, last August.

Fast action by two of Shearin's employees thwarted Englezas before he could leave town. Maria George and Debbie Robinson, along with Shearin's wife, Heather, contacted police. An attorney went to the home of Associate Circuit Court Judge Don Judah on Saturday morning and obtained a court order to stop Englezas.

"The man was robbing us in broad daylight," George said.

A Buchanan County Sheriff's deputy, serving the court order, prevented Englezas from driving away in the truck long enough for Shearin's employees to search the truck and remove items that belonged to Shearin.

The items removed from the truck, which Shearin said belonged to him, included $7,000 worth of wine and liquor, a microwave oven, a large quantity of spices, china, wine goblets, steam table pans and trays, and nostalgic wall decorations.

Shearin said his contract with Englezas said that nothing could be removed from the restaurant without Shearin's permission. Englezas, who had been living rent-free in the apartment Shearin owned above the restaurant, has not been seen since

Saturday, when he drove away in the rented moving truck.

Due to the court order, both the restaurant and the apartment have been sealed with evidence tape until the matter is cleared up.

Shearin has been unable to enter the restaurant or the apartment to take an inventory. He has not asked the prosecutor to file any criminal charges, but vows there "will be legal ramifications."

"I have no idea what's going on," Shearin said Wednesday. "It's a real mess for me, of course. And I feel bad to see this happen to Bistro because I have some emotional ties to it. One thing I do know is that those girls who are working for me did a good job of saving my bacon."

Shearin thinks the quick departure of Englezas likely was caused by Shearin's pulling the liquor license for the restaurant Feb. 2. Englezas had been operating the business with the license that Shearin had obtained. Shearin said he asked Englezas several times to get his own liquor license.

"I finally pulled my liquor license after he made no effort to get his own," Shearin said. "A liquor control agent suggested it because I was liable for anything in my name."

On Saturday night, a large vase, which had been sitting by the back door of Bistro Blues, was heaved through the front plate glass window of Shearin's nearby restaurant, Dante's Pizza & Pasta.

Shearin, notified by police, said he called Englezas in the middle of the night and accused him of the act.

"I told him to come get his vase, that his fingerprints were on it," Shearin said.

He said Englezas knew he was leaving town last weekend to attend the convention in Atlanta. Shearin said Englezas was two months behind in rent and, according to court records, Englezas owed Shearin $1,000. Shearin said Englezas apparently also owes money to a number of vendors, who have been calling Shearin's office.

Englezas claimed when he took over Bistro Blues that in the two previous years he had owned and operated his own restaurant in Decatur, Ill., called Big Daddy's Steakhouse. Englezas said he moved to St. Joseph and went into business locally to be closer to his former wife and their children.

The civil case is scheduled to be heard in Division 6 at 1 p.m. on March 9.

A few months after the publication of the article, Mr. Englezos filed a lawsuit against the reporter, Mr. Raffensperger, and against the News–Press. He asserted that the allegations and implications of the article that he had failed to pay past-due rent, that he was taking property not belonging to him, that he had vandalized the restaurant, and that there was a court order preventing him from leaving town and the sheriff had stopped him from doing so, were defamatory. He requested actual and punitive damages against both defendants.

The case was tried beginning on November 12, 1995. At trial, the plaintiff presented evidence which showed several inaccuracies in Mr. Raffensperger's News–Press article. Mr. Englezos testified that after Mr. Shearin revoked the liquor license for the restaurant in February 1994, he decided to change the theme of the restaurant from a Greek tavern to a family-style buffet. On February 4, 1994, Mr. Englezos and some of his employees stayed late after the closing of the restaurant to prepare for the remodeling. On that evening, two of Mr. Shearin's employees arrived with a police officer to investigate what they were doing. After Mr. Englezos explained that they were redecorating, the officer and Mr. Shearin's employees left.

On the following day, February 5, 1994, Mr. Englezos began to remove equipment from the restaurant to store during the renovation. While Mr. Englezos was loading equipment on a truck, a sheriff's deputy arrived and served him with a summons stating he had improperly failed to pay the Shearins rent and utilities on the first day of the month for the month of February 1994. A copy of the lease agreement, however, showed that rent was not due until the fifteenth of each month. The deputy sheriff testified that he did not observe any criminal activity at the restaurant, but stated that he

stayed at the restaurant for a while to "keep the peace" because there were a lot of other people in the parking lot, including Mrs. Shearin. The deputy further testified that he did not put up police tape or barricades and did not prevent Mr. Englezos from leaving the restaurant in his truck, as was erroneously reported in the News–Press article.

A few days after the incident, Mr. Raffensperger conducted telephone interviews with the Shearins and some of their employees. Mr. Raffensperger testified that he was unsuccessful in his attempts to contact Mr. Englezos. He also admitted that he did not check additional potential sources of information, such as the court file or the sheriff's department, to verify the information he received from the Shearins. He stated that he did talk with Judge Judah, the judge that signed the summons served by the deputy sheriff and was who told that Mr. Shearin was claiming that Mr. Englezos owed him some money. Mr. Raffensperger also stated that, although he did not have both sides of the story, the editors of the paper decided that it was a sufficiently important story to tell the readers and that follow-up stories could be done later once more facts and information were acquired.

Although Mr. Raffensperger and the News–Press did not claim at trial that the allegations in the article were true, they argued that they both had acted in good faith and without malice in printing the story, and that they had acted in an acceptable journalistic fashion in printing the article, even though many of its statements were not later borne out. In response, Mr. Englezos called Donald P. Ranly, Ph.D., as an expert to testify as to the standards in the journalism industry. Dr. Ranly stated that Mr. Raffensperger's article failed to comport with the principles of truth and accuracy and fair play promulgated by the American Society of Newspaper Editors. Dr. Ranly further stated that several things in the article should have been "red flags" to any editor, especially the fact that the article was one-sided because there was no outside source to confirm the statements made by the Shearins.

Following the presentation of evidence, the court denied the defendants' motion for directed verdict. The case was bifurcated. The court first submitted the issue of liability for actual damages, the amount of actual damages, and liability for punitive damages. The jury found both the reporter and the News–Press directly liable for defamation and awarded actual damages of $20,000. It found Mr. Raffensberger not liable for punitive damages, but it did find the News–Press liable for punitive damages.

The court adjourned for the weekend. It was planned that the second stage of the bifurcated trial, addressing the amount of punitive damages, would occur on the following Monday morning, once Mr. Englezos offered evidence of the News–Press' net worth. On Monday morning, however, the court announced it had reconsidered its ruling denying the News–Press' motion for directed verdict on the issue of punitive damages, and granted that motion. In so ruling, the court stated:

> The United States Supreme Court has . . . held that in order to recover punitive damages from a media defendant, a plaintiff such as Mr. Englezos must show through clear and convincing evidence that the defendant acted with actual malice.
>
> . . . .
>
> After reviewing the relevant case law and the evidence presented in this trial in a light most favorable to the Plaintiff, this Court finds as a matter of law that the evidence is not sufficient to support a finding that the News–Press and Gazette Company acted with actual malice in publishing the subject statements. Therefore, Plaintiff is not entitled to an award of punitive damages against the defendant News–Press & Gazette Co.
>
> This Court sustains Defendant News–Press' motion for directed verdict on the issue of punitive damages and directs a verdict in favor of the News–Press on the issue of punitive damages only.

On December 6, 1996, the court entered judgment in favor of Mr. Englezos on his claim of defamation against the News–Press and Mr. Raffensperger for actual damages of $20,000, and against Mr. Englezos on the issue of punitive damages. He overruled the

parties' motions for judgement notwithstanding the verdict (JNOV) and for a new trial. Both parties have appealed.

## II. STANDARD OF REVIEW

■ In our review of the grant of a directed verdict in favor of a defendant, we " 'will determine whether the plaintiff has introduced substantial evidence that tends to prove the facts essential to plaintiff's recovery,' or in other words, whether the plaintiff has made a submissible case." *Wright v. Over–the–Road and City Transfer Drivers, Helpers, Dockmen and Warehousemen,* 945 S.W.2d 481, 489 (Mo.App.1997), *citing, Wilkerson v. Mid–America Cardiology,* 908 S.W.2d 691, 695 (Mo.App.1995), and *Friend v. Holman,* 888 S.W.2d 369, 371 (Mo.App. 1994). We will " 'review the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences, and disregarding the defendant's evidence except as it aids the plaintiff's case.' " *Wright,* 945 S.W.2d at 489, *quoting, Wilkerson,* 908 S.W.2d at 695. *See also Seward v. Terminal R.R. Ass'n,* 854 S.W.2d 426, 428 (Mo. banc 1993).

■ Because the grant of a directed verdict is a drastic measure, "[t]here is a presumption in favor of reversing a trial court's grant of a motion for a directed verdict unless, upon consideration of the facts most favorable to the plaintiff, 'those facts are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to a result.' " *Wright,* 945 S.W.2d at 489, *quoting, Friend,* 888 S.W.2d at 371. However "liability cannot rest upon guesswork, conjecture, or speculation beyond inferences that can reasonably decide the case," *Garrett v. Overland Garage & Parts, Inc.,* 882 S.W.2d 188, 191 (Mo.App.1994). For this reason, direction of a verdict will be affirmed if any one of the elements of the plaintiff's case is "not supported by substantial evidence." *Mathis v. Jones Store Co.,* 952 S.W.2d 360, 366 (Mo.App.1997).

■ We review the denial of a motion for a new trial for an abuse of discretion. *Kansas City v. Keene Corp.,* 855 S.W.2d 360 (Mo. banc 1993). However, where "the basis for the grant of the motion for a directed verdict and the denial of the motion for new trial are the same, if we affirm the trial court's order granting the motion for a directed verdict, we necessarily must affirm its order denying [the] motion for a new trial." *Wright,* 945 S.W.2d at 490.

## III. THE PLAINTIFF ADEQUATELY PROVED DEFAMATION UNDER THE FAULT–BASED STANDARD APPLICABLE TO A PRIVATE PLAINTIFF

■ As noted above, the liability of the News–Press and of Mr. Raffensperger for actual damages for defamation was submitted on a theory of negligence, or fault, in publishing the article without adequate investigation. "Fault" is the standard of proof usually required in Missouri and elsewhere where the claim is that a private figure was defamed by a media defendant. *See* 1 Slade R. Metcalf et al., *Rights and Liabilities of Publishers, Broadcasters and Reporters* § 1.17, at 1–52 (1997); *Williams v. Pulitzer Broadcasting Co.,* 706 S.W.2d 508, 512 (Mo. App.1986). By contrast, where a public figure is the subject of the defamatory publication, then under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), proof of actual malice is required even for liability for actual damages. In both cases, clear and convincing evidence of actual malice is required for recovery of punitive damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347–48, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Williams,* 706 S.W.2d at 512; *Kennedy v. Jasper,* 928 S.W.2d 395, 400 (Mo.App.1996).

The trial court submitted Mr. Englezos' claims against the News–Press on a fault rather than an actual malice theory.[1] While

---

**1.** The verdict-directing instructions against the News–Press stated:

Your verdict must be for plaintiff and against defendant News–Press & Gazette if you believe:

First, Defendant News–Press & Gazette authored or published the following statements: . . . [list of allegedly defamatory statements connected by conjunctive or], and

defendants do not claim that Mr. Englezos was a public figure, they nonetheless claim that the trial court should have required the jury to find actual malice in order to find for Mr. Englezos on his actual damage claim, just as is required in the case of a public figure, since the subject of the article was a "matter of public concern."

 We disagree. In *Gertz*, 418 U.S. at 347–48, 94 S.Ct. 2997, the United States Supreme Court held that the First Amendment does not require the states to require proof of actual malice to impose liability for defamation involving a private plaintiff, whether or not the issue is one of public concern or interest. Rather, the Court stated:

We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation.

*Id.* Since *Gertz* was handed down, states have not been uniform in their adoption of standards for the imposition of liability for actual damages for defamation involving a private figure. Some have required a showing of gross negligence, and others actual malice, but "the vast majority of states have accepted the subtle invitation of the *Gertz* court and adopted a negligence standard." 1 Slade R. Metcalf et al., *Rights and Liabilities of Publishers, Broadcasters and Reporters* § 1.17, at 1–52 (1997). *See also* Restatement

(Second) of Torts § 580B cmt. h (1977). Missouri has joined the majority of states, and applies a fault standard for defamation claims requesting actual damages on behalf of a private figure. *Williams*, 706 S.W.2d 508, 512. As such, a private figure must prove only the elements set out in MAI 23.06(1), and submitted to the jury below, to wit:

The plaintiff must prove: (1) defendant published the defamatory statement; (2) defendant was at fault in publishing the statement; (3) the statement tended to expose plaintiff to hatred, contempt and ridicule; (4) the statement was read by other persons or by the public; and (5) plaintiff's reputation was thereby damaged.

*Kennedy*, 928 S.W.2d 395, 400.

The News–Press and Mr. Raffensperger have not claimed that the evidence was insufficient to establish fault on their part, nor that Mr. Englezos was a public figure, nor would the record have supported such contentions. They merely claim that fault is not the appropriate standard and that actual malice is because here the subject of the article was a matter of public concern. As noted, that is not Missouri law. Thus, we need not review the sufficiency of the evidence to establish fault. Having found no Missouri authority for application of a standard other than fault even where the article concerns a matter of public concern, we hold the trial court did not abuse its discretion by entering judgment on the jury's verdict for actual damages based on that standard.[2]

## IV. THE NEUTRAL REPORTAGE DOCTRINE DOES NOT APPLY AND WOULD NOT BAR RECOVERY

 The News–Press and Mr. Raffensperger alternatively argue that they were

Second, one or more of such statements was false, and
Third, defendant News–Press & Gazette Company was at fault in publishing one or more of such statements, and
Fourth, one or more of such statements tended *to expose plaintiff to contempt*, hatred, humiliation, ridicule or deprive plaintiff of the benefit of public confidence and social associations, and
Fifth, one or more of such statements was read *or heard by the public*, and

Sixth, plaintiff's reputation was thereby damaged.

2. Parenthetically, we note that if we were to accept the claim that the squabble between two businessmen at issue here is a matter of public concern, then we would be hard-pressed to state that any matter which was the subject of a news story was not a matter of public concern; otherwise, why would the newspaper have covered it? This "exception" to the fault standard would thus soon swallow the rule.

entitled to a directed verdict because their conduct was privileged in that "all of the statements published by defendants in the article in question were privileged under the 'neutral reportage' doctrine in that the evidence showed that they were reported in a neutral, unbiased and accurate manner." They state that, although this doctrine has not yet been adopted in Missouri, this would be an appropriate case in which to do so.

The "neutral reportage" doctrine was applied by the United States Court of Appeals for the Second Circuit in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2d Cir.1977). *Edwards* held that there was an absolute privilege available to those who fairly and accurately report newsworthy charges made by one public person against another, even if the reporter has "serious doubts" regarding the truth of the statements reported. This is because the newsworthy issue is the fact that the statements were made, not their accuracy. However, this privilege is not unlimited, so that "a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage. In such instances he assumes responsibility for the underlying accusations." *Id.*, 556 F.2d at 120.

There is no consensus outside Missouri as to the merits of the "neutral reportage" privilege. Some courts have refused to follow *Edwards*, finding that it conflicts with the principles set out in *Gertz* and other United States Supreme Court cases holding that the relevant issue in deciding the standard of proof in a defamation case is whether the subject of the statements is a public or private figure, not whether the issue involved is newsworthy. *See Dickey v. CBS, Inc.*, 583 F.2d 1221 (3d Cir.1980); *Hogan v. Herald Co.*, 84 A.D.2d 470, 446 N.Y.S.2d 836, 841–42 (N.Y.App.Div.1982); *Catalano v. Pechous*, 83 Ill.2d 146, 50 Ill.Dec. 242, 419 N.E.2d 350 (1980). Those cases that do apply the doctrine almost uniformly limit it to statements

by public persons about other public persons. *See, e.g., Dixson v. Newsweek, Inc.*, 562 F.2d 626, 630–31 (10th Cir.1977).

■ As noted, Mr. Englezos is not a public figure, and even if he were, Missouri has never adopted the "neutral reportage" doctrine. In *Shafer v. Lamar Publishing Co.*, 621 S.W.2d 709, 711 (Mo.App.1981), this Court did, however, adopt the following privilege set out in Restatement (Second) of Torts Section 611 (1976):

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrences reported.

This privilege is similar to the privilege of neutral reportage, but is more limited in scope. By its terms, it applies only to those matters of public concern which are stated in a report of an official action or proceeding or a meeting open to the public.[3] Clearly, none of the matters at issue in this case, other than possibly the court order, fall within these parameters, and the court order was not accurately reported. We are offered no policy reasons why we should consider adopting a broader privilege such as the neutral reportage privilege, nor why we should expand it to apply to private figures such as Mr. Englezos.

Moreover, even if Missouri did recognize this type of privilege and did apply it to private figures, large portions of the article in question clearly went beyond the bounds of neutral reportage. The article simply did not accurately report allegations on matters of public concern. It offered the reporter's comment that the restaurant appeared to have "died an ugly death," stated as fact that Mr. Englezos "tried to leave town in a rented truck full of equipment and supplies belonging to the restaurant," also stated as fact that "fast action by two of Shearin's employees thwarted Englezas [sic] before he could leave

---

3. In *Hoeflicker v. Higginsville Advance, Inc.*, 818 S.W.2d 650 (Mo.App.1991), we rejected comment e to Section 611, which stated that the privilege did not extend to Petitions filed until the court took some action regarding them. We held that the privilege does extend to reporting matters in a Petition as soon as it is filed.

town," inaccurately reported the subject of a court order and that a sheriff's deputy allegedly prevented Mr. Englezos from leaving town, and so forth. This is not neutral reportage of accusations made by others. It does not come within the claimed privilege for neutral reportage, even assuming Missouri will recognize that privilege in an appropriate case.

## V. THE TRIAL COURT CORRECTLY DIRECTED A VERDICT ON THE ISSUE OF PUNITIVE DAMAGES BECAUSE THERE WAS NO EVIDENCE OF ACTUAL MALICE

Mr. Englezos argues on appeal that the trial court erred in holding that he failed to make a submissible case of punitive damages against the News–Press.

Both parties agree that the United States Supreme Court held in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), that the plaintiff must prove *actual malice* in order to recover punitive damages against a media defendant, so as to avoid the danger that the threat of punitive damages might result in unnecessary media self-censorship. Missouri courts have applied this rule in cases involving defamation against either a public or private media defendant, *see, e.g., Carter v. Willert Home Products, Inc.*, 714 S.W.2d 506, 512 (Mo. banc 1986), and have required that actual malice be proved by clear and convincing evidence. *Williams*, 706 S.W.2d 508, 512–13 (Mo.App.1986). The parties disagree, however, as to what constitutes actual malice and whether a submissible case of actual malice was offered here.

The Missouri Supreme Court has explained what constitutes actual malice in a defamation case as follows:

> In order to recover punitive damages, or overcome a qualified privilege, [a private] plaintiff was required to prove that the statements were made with knowledge that they were false or with reckless disregard for whether they were true or false at the time when defendant had serious doubts as to whether they were true.

*Carter*, 714 S.W.2d at 512, *citing, MAI 4.15* and *Gertz*, 418 U.S. at 349, 94 S.Ct. 2997.

*See also New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (actual malice requires proof that defendant published defamatory material "with knowledge that it was false or with reckless disregard of whether it was false or not"); *Williams*, 706 S.W.2d 508, 512 ("punitive damages [can] only be awarded on a finding of actual malice"). This standard in Missouri remains unchanged. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 313, n. 4 (Mo. banc 1993) (citing to MAI 4.15 as the standard for punitive damages involving private plaintiffs).

Unlike common law malice, which requires a showing of ill-will, this type of actual malice has been referred to as requiring a showing of *scienter.* Prosser, Handbook of the Law of Torts § 118, at 821 (4th ed.1971). The Missouri Supreme Court has explained that this "standard has consistently been a subjective one—the test not being whether a reasonably prudent person would have had serious doubts as to the truth of the publication, but whether the defendant in fact entertained such doubts." *In re Westfall*, 808 S.W.2d 829, 836–37 (Mo. banc 1991). Actual knowledge of the falsity of a publication is difficult to prove. Thus, most successful plaintiffs have relied on a finding of reckless disregard for the truth or falsity of the publication to establish actual malice. The United States Supreme Court, in defining the reckless disregard standard, has similarly stated that:

> Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). *See also Glover v. Herald Co.*, 549 S.W.2d 858, 860–62 (Mo. banc 1977) (the Missouri Supreme Court cites, *inter alia*, to *St. Amant* in explaining the actual malice standard and finds that a public official, although she pre-

sented evidence of negligence, had failed, as a matter of law, to demonstrate actual malice).

It is this standard which we apply here. In so doing, we note that the "question of malice is a jury question, 'unless there is no substantial evidence of express or actual malice, in which case the court should direct a verdict.'" *Wright v. Over–the–Road and City Transfer Drivers, Helpers, Dockmen and Warehousemen*, 945 S.W.2d 481, 490 (Mo.App.1997), *quoting, Estes v. Lawton–Byrne–Bruner Ins. Agency*, 437 S.W.2d 685, 691 (Mo.App.1969). For this reason, in our review, "'we can neither supply evidence nor ignore evidence binding on [the plaintiff], nor can we use [our standard of review] as a basis for unreasonable, speculative or forced inferences.'" *Wright*, 945 S.W.2d at 494, *quoting, Adler v. Laclede Gas Co.*, 414 S.W.2d 304, 306 (Mo. banc 1967).

To prove actual malice, Mr. Englezos was required to make a submissible case that the News–Press published the article with knowledge of its falsity or with reckless disregard for its truth at a time when it had serious doubts as to its truth. Mr. Englezos claims that he met this standard because he presented evidence that (a) the News–Press had obvious reasons to doubt the veracity of Mr. Shearin, since he was out of town when the events allegedly occurred; (b) the reported allegations of criminal conduct by Mr. Englezos were so inherently improbable that only a reckless man would have put them in circulation; and (c) the News–Press departed from the standards of investigation ordinarily adhered to by responsible journalists in failing to consult the court file or interview either the sheriff's deputy or Mr. Englezos, despite editor George Lockwood's express instruction to Raffensperger on February 9, 1994, to "get the other side of the story." Mr. Englezos claims that the latter failure was so extreme that reasonable persons could conclude only that the News–Press, in fact, entertained serious doubts about the truth of the publication.

All of these assertions are, at their base, claims that the News–Press failed to adequately investigate the assertions made in the story, and that it should have known that its reporter needed to investigate further because, on their face, the assertions were incredible and came from persons with a personal bias against Mr. Englezos. We disagree that this provides a basis for submission of punitive damages.

The United States Supreme Court has held that "[f]ailure to investigate does not in itself establish bad faith." *St. Amant*, 390 U.S. at 733, 88 S.Ct. 1323. *See also Connaughton v. Harte Hanks Communications, Inc.*, 842 F.2d 825 (6th Cir.1988); *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309 (7th Cir.1988); *Schultz v. Newsweek, Inc.*, 668 F.2d 911, 918 (6th Cir.1982) (holding mere evidence of an incomplete investigation is insufficient to establish an inference of actual malice). Similarly, the mere fact the reporter has failed to speak to the person the publication concerns before publishing the story does not support an award of punitive damages. *Davis v. Costa–Gavras*, 654 F.Supp. 653, 657 (S.D.N.Y.1987); *Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 93 (S.D.N.Y.1980). It is only where there is, in addition, other evidence indicating actual malice that:

> Facts such as failure to investigate, or reliance on a questionable source are relevant to that determination; they may tend to show that a publisher did not care whether an article was truthful or not, or perhaps that the publisher did not want to discover facts which would have contradicted his source.

*Pep. v. Newsweek, Inc.*, 553 F.Supp. 1000, 1003 (S.D.N.Y.1983).

We applied these principles in *Wright v. Over–the–Road and City Transfer Drivers, Helpers, Dockmen and Warehousemen*, 945 S.W.2d 481, 497 (Mo.App.1997). We there dismissed the plaintiff's claim, and in so doing, rejected the argument that defendant's failure to investigate, when the defendant had knowledge that the information came from a "known liar," was evidence of actual malice. We also held that the plaintiff had failed "to point to anything in the record that would support an inference that the statements were so obviously false that the [defendant] would have been immediately put on

notice of their falsity and the need to investigate their veracity before publishing." *Id.* Accordingly, we held that the plaintiff had failed, as a matter of law, to make a submissible case, because she was "forced to rely on unreasonable, forced, and impermissible inferences, as well as inference stacking, requiring a reasonable jury to engage in speculation and conjecture." *Id.* Thus, we held that the trial court was correct in sustaining the defendant's motion for a directed verdict. *Id.* at 498

Similarly, here, the defendant's failure to fully investigate does not, as a matter of law, establish a submissible case for punitive damages. The jury would be forced to rely on unreasonable and impermissible inferences, and to speculate that the News–Press and Mr. Englezos seriously doubted the accuracy of the article published, and yet published it in spite of these doubts. There was simply no evidence to support such a finding. There was evidence of negligence in failing to further corroborate evidence from biased sources and in reporting inaccurately some of the information obtained from the court and others. However, there was evidence of some effort at corroboration, and the reporter did speak to numerous sources before preparing his story, and not all of those sources were biased. This evidence merely supports the submission of actual damages; it does not provide a basis for submitting punitive damages. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 288, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Fadell v. Minneapolis Star & Tribune Co., Inc.,* 557 F.2d 107, 109 (7th Cir.1977) (neither factual inaccuracies, nor mere negligence in reporting them, amount to reckless disregard).

The mere failure of defendants to verify all of the facts learned from each source, and the mere fact that the reporter relied in part on biased sources, simply does not in itself provide a basis for finding actual malice or for awarding punitive damages. *Samborsky v. Hearst Corp.,* 2 Media L. Rep. (BNA) 1638 (D.Md.1977); *Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024, 1027–28 (5th Cir.1975); *Washington Post Co. v. Keogh,* 365 F.2d 965, 972–73 (D.C.Cir.1966).

While Mr. Englezos claims that the allegations of his alleged "criminal conduct" were so inherently improbable that only a reckless man would have put them in circulation, he does not explain why this is so. It is an unfortunate fact that criminal conduct occurs every day. Here, the reporter stated that a respected restaurant owner and businessman had accused his tenant of criminal conduct. Portions of the report were verified. Although these allegations were ultimately unfounded, and supported the submission of the claim for actual damages, we fail to see how these allegations were inherently improbable; they were simply inaccurate.

In a similar case, *Williams v. Pulitzer Broadcasting Co.,* 706 S.W.2d 508, 512–13 (Mo.App.1986), the Eastern District held that the court erred in submitting the issue of punitive damages to the jury, because, although the plaintiff had established the "fault" required for actual damages, he had failed to demonstrate by clear and convincing evidence that the publisher seriously and consciously doubted the truth of the information he published. Thus, the court reversed the award of punitive damages. *Id.* at 513. We similarly hold that, although Mr. Englezos established fault on the News–Press' part, he has failed to establish the actual malice necessary to submit punitive damages by clear and convincing evidence. Accordingly, the trial court did not err in sustaining the defendant's motion for a directed verdict on the issue of punitive damages.

## VI. THE TRIAL COURT HAD THE POWER TO RECONSIDER ITS OWN INTERLOCUTORY DECISION DENYING DEFENDANT'S MOTION FOR DIRECTED VERDICT

Mr. Englezos finally claims that, once the trial court denied defendant's motion for directed verdict on the issue of punitive damages, it was required to submit punitive damages to the jury and was powerless to reconsider its ruling and grant the motion for directed verdict. While we agree with Mr. Englezos that it is unusual for a trial court to first deny a motion for directed verdict on the issue of punitive damages, but then to grant it after the jury has come back

with a finding of liability, we are aware of no basis for holding that a trial court has no authority to follow this procedure. The only authority he cites is Section 510.263 RSMo 1994, which states that "if during the first stage of a bifurcated trial the jury determines that a defendant is liable for punitive damages, *that jury shall determine*, in a second stage of the trial, the amount of punitive damages to be awarded against such defendant" (emphasis added). Mr. Englezos argues that, because the statute uses the word "shall," the court was prohibited from granting a directed verdict once the jury found defendant liable for punitive damages.

We disagree. Section 510.263 does not state that the trial court shall or must conduct the second phase of the trial even if it has determined that the plaintiff has failed to make a submissible case on the issue of punitive damages. It simply mandates the procedure to be followed in determining the amount of punitive damages where the jury has determined liability for punitive damages. Here, however, the court in effect ruled that it had erred in allowing punitive damages to go to the jury at all, because no submissible case had been made of actual malice. Nothing barred it from correcting a prior, incorrect interlocutory ruling of this type.

 To the contrary, "[a]t any time before final judgment a court may open, amend, reverse or vacate an interlocutory order." *Around the World Importing, Inc. v. Mercantile Trust Co.*, 795 S.W.2d 85, 88 (Mo.App.1990), *citing, Woods v. Juvenile Shoe Corporation*, 361 S.W.2d 694, 695 (Mo. 1962). As explained by the Missouri Supreme Court:

> Logic and justice would seem to indicate that a trial court should be permitted to retain control of every phase of a case so that it may correct errors, or, in its discretion, modify or set aside orders or judgments until its jurisdiction is extinguished by the judgment becoming final and appealable.

*State ex rel. Schweitzer v. Greene*, 438 S.W.2d 229, 232 (Mo. banc 1969). "Missouri does not follow the doctrine that a motion once ruled on cannot be reconsidered."

*Around the World Importing*, 795 S.W.2d at 88, *citing, Richey v. Meter Investments, Inc.*, 680 S.W.2d 381, 384 (Mo.App.1984). "To do so would mean that a trial court could never correct what it ultimately concludes to have been a mistaken judgment even when its jurisdiction over the case remains intact." *Id.*

■ A ruling on a motion for a directed verdict is not a "final judgment." *Powell v. Watson*, 516 S.W.2d 51, 52 (Mo.App.1974). The trial court had the authority to grant the directed verdict when it was first requested. Its denial of the motion is considered provisional only, and subject to reconsideration upon the filing of a motion for JNOV. The court thus had power to grant a directed verdict before submission of the case to the jury, and of granting JNOV after submission of both parts of the bifurcated case to the jury.

Yet, plaintiff would have us hold that the court has no authority to grant a directed verdict during the hours or days between initial submission of the case and the jury verdict in the second portion of the bifurcated trial. We do not believe that either precedent or logic requires us to accept this argument. Moreover, since we have found that the evidence did not support submission of punitive damages, any procedural irregularity in the timing of the court's ruling could not have been prejudicial.

For the reasons set forth above, we affirm the judgment below.

HANNA, P.J., and HOWARD, J., concur.